MATTHEWS v BLUE CROSS AND BLUE SHIELD OF MICHIGAN

Docket No. 104011. Argued October 7, 1997 (Calendar No. 1). Decided
January 21, 1998. Rehearing denied *post* 1230.

Robert E. Matthews, D.D.S., was charged in the Oakland Circuit Court
with three counts of false pretenses with intent to defraud over one
hundred dollars and two counts of filing false health care claims
involving dental surgeries performed at Sinai Hospital. Following a
bench trial, the court, Frederick C. Ziem, J., acquitted the defend-
ant, holding that his guilt had not been established beyond a rea-
sonable doubt. Criminal charges had been initiated by the Oakland
County prosecutor following an investigation by the state police on
the basis of information submitted by Blue Cross and Blue Shield
of Michigan regarding billing irregularities involving technical surgi-
cal assistance claims submitted by Dr. Matthews. After his acquit-
tal, Dr. Matthews brought a malicious prosecution action in the
Wayne Circuit Court against Blue Cross. The court, John H.
Hausner, J., denied the defendant's motion for a directed verdict
and entered judgment on a jury verdict for the plaintiff. The Court
of Appeals, WAHLS, P.J., and CAVANAGH and N. J. LAMBROS, JJ.,
affirmed in an unpublished opinion per curiam (Docket No.
145934). The defendant appeals, limited to whether there was a
question of fact requiring the issue of probable cause to be submit-
ted to the jury.

In an opinion by Justice BOYLE, joined by Chief Justice MALLETT,
and Justices BRICKLEY, WEAVER, KELLY, and TAYLOR, the Supreme
Court *held*:

The plaintiff failed to meet the burden of presenting an issue of
fact to the jury regarding probable cause for criminal prosecution.
In Michigan, prosecution is initiated at the sole discretion of the
prosecutor. There was no evidentiary basis for the claim that the
prosecution was initiated or maintained by the defendant's agents.
An independent investigation conducted by the state police sup-
ported probable cause to believe that a crime had been committed.
There was no evidence to dispute probable cause, and the trial
court should have directed a verdict for the defendant and deter-
mined that probable cause was established as a matter of law.

1. A plaintiff asserting malicious prosecution must prove that the defendant has initiated a criminal prosecution, that the criminal proceedings terminated in the plaintiff's favor, that the private person who instituted or maintained the prosecution lacked probable cause, and that the action was undertaken with malice or a purpose other than bringing the offender to justice, i.e., the plaintiff must make a prima facie showing that the defendant's agents lacked probable cause to believe that the plaintiff had committed a crime. Whether the prosecutor might have made a different decision is irrelevant.

2. A public prosecutor is not liable for malicious prosecution. Against a private person, a plaintiff must prove that the private person instituted or maintained the prosecution and that the prosecutor acted on the basis of information submitted by that person which did not constitute probable cause. Independent exercise of prosecutorial discretion establishes that the private defendant did not initiate the prosecution. In this case, the information developed by the officer was submitted to the prosecutor who authorized issuance of a warrant on grounds that established probable cause to believe that the plaintiff had committed a felony. Thus, Blue Cross did not initiate or maintain the prosecution as a matter of law. Because there was no basis for disputing that there was probable cause for the prosecution, the trial court should have resolved the question as a matter of law.

3. Determination of probable cause requires application of an objective test, viewing the facts as would a reasonable person under the circumstances. Blue Cross clearly had probable cause to believe that the plaintiff probably had made false claims for reimbursement. Alteration of the surgical records itself was sufficient to raise suspicions of any prudent businessperson. This, combined with the advice of other oral surgeons that Dr. Matthews had provided no services and did not have their permission to make a contrary representation, permitted the conclusion that Dr. Matthews probably had committed a felony. No evidence was presented that the prosecution was initiated other than at the sole discretion of the prosecutor on the basis of an independent investigation.

Justice CAVANAGH, concurring, stated that because the evidence supported Blue Cross and Blue Shield's assertion that Dr. Matthews was improperly billing technical surgical assistance at a teaching hospital, as the term is defined in the 1979 or 1984 manual, probable cause existed to bring charges against him.

Reversed and remanded.

*Vander Male, Bellamy, Gilchrist, Vande Vusse &
Cafferty, P.C.* (by *Frederick B. Bellamy* and
*Michael S. Cafferty*), for the plaintiff.

*O'Leary, O'Leary, Jacobs, Mattson, Perry &
Mason, P.C.* (by *John P. Jacobs*), for the defendant.

BOYLE, J. We granted leave to appeal to decide
whether the trial court erred in its determination that
the plaintiff, in this malicious prosecution action, sus-
tained the burden of presenting a jury submissible
issue of fact regarding probable cause for criminal
prosecution. We hold that plaintiff failed to meet that
burden and that the trial court's conclusion to the
contrary was error.

In Michigan, prosecution is initiated in the sole dis-
cretion of the prosecutor. There was no evidentiary
basis for the claim that the prosecution was initiated
or maintained by defendant's agents. An independent
investigation conducted by the state police supported
probable cause to believe that a crime had been com-
mitted. There was no evidence to dispute probable
cause, and the trial court should have directed a ver-
dict for the defendant and determined that probable
cause was established as a matter of law.

I

Because the issues involved in the claim of mali-
cious prosecution turn on which issues are or might
be controverted, we begin our analysis with the fol-
lowing undisputed facts.

Dr. Robert Matthews, a dentist specializing in
orthodontics, was charged and acquitted in a bench
trial of three counts of false pretenses with intent to

defraud over one hundred dollars[1] and two counts of filing false health care claims[2] involving surgeries performed at Sinai Hospital. The prosecution had alleged that Dr. Matthews had been paid by Blue Cross for services he did not perform or for which he was not entitled to claim reimbursements. Dr. Matthews had billed technical surgical assistance (TSA) under the regular business classification for Blue Cross physician providers[3] for participation in oral orthognathic surgeries performed at Sinai Hospital by several dif-

---

[1]    Any person who, with intent to defraud or cheat, shall . . . or by any . . . false pretense, . . . obtain from any person any money . . . or other valuable thing or service [which] shall be of the value of more than $100.00, such person shall be guilty of a felony, punishable by imprisonment in the state prison not more than 10 years or by a fine of not more than $5,000.00. [MCL 750.218;    MSA 28.415.]

[2]    (1) A person shall not make or present or cause to be made or presented to a health care corporation or health care insurer a claim for payment of health care benefits knowing the claim to be false.

*     *     *

(5) A person who violates this section is guilty of a felony punishable by imprisonment for not more than 4 years, or by a fine of not more than $50,000.00, or both. [MCL 752.1003;    MSA 28.547(103).]

[3] Dr. Matthews' Blue Cross physician information report indicates that he applied for a provider number and that his provider number was approved for Medicare and regular business only. Dennis Drake testified that the five surgeries in question were billed under the Blue Cross and Blue Shield regular business program in accordance with the subscriber's contract in these claims. By signing the claim form, the physician certifies that the services were performed in accordance with the provisions of the subscriber's contract. The Physician's Manual, Section One—General Information, provides a copy of the Blue Cross physicians registration agreement in which the participant agrees to accept payment for covered services in accordance with the terms of the subscriber's contract in effect at the time service is rendered.

ferent oral surgeons on a number of orthodontic patients.[4]

Technical surgical assistance was described by Blue Cross in the regular business section of the physician's instruction manual, p 2-20, as "[t]he professional, active assistance given the operating physician . . . for an eligible surgical or obstetrical procedure." Surgical benefits are "available wherever provided when medically necessary."[5] *Id.*, p 2-19. The manual specifies that claims for billings submitted under the regular business program are subject to the following restrictions: (1) the location of service must be "inpatient" hospital; (2) the service can "only be billed when surgical assistance by a hospital intern, resident or house officer is not available," (3) in "institutions with an approved intern resident training program, the surgeon in charge must certify that ser-

---

[4] Dennis Drake reviewed sixty claims from January, 1982, through October, 1984. Dr. Matthews admitted billing for sixty TSAs from 1978 through 1985, and receiving Blue Cross payments for them as a result of filing claims.

[5] Blue Cross and Blue Shield of Michigan Physician's Manual, pp 2-19 through 2-20, July, 1979, describes the following services.
Surgery is defined as

A branch of medicine consisting of manual and operative procedures for diagnosis and treatment of diseases, repair of injuries (fractures or dislocations), and correction of deformities or defects which impair body functions.

\* \* \*

Dental surgery is a benefit for multiple extractions or removal of unerupted teeth for a hospital bedpatient with a concurrently hazardous medical condition.

\* \* \*

Oral surgery is limited to conditions not directly related to or caused by the teeth or their sockets.

vices of interns, residents or house officers were not available;" (4) such certification is to "be submitted with the TSA claim."[6]

The section of the policy manual dealing with copayments under the Blue Cross cost-sharing programs was added to the Physician's Manual in 1984. It covers subscriber contracts that require both deductibles and copayments.[7] As with the regular business program, the cost-sharing policy provided that "[a]ll services that are listed as benefits are only payable if they are medically necessary." The section of the manual setting out the policy for reimbursing claims under the regular business program used the word "active" in describing the surgical assistance services that would be reimbursed under that program. The word "active" was not included in describing technical surgical assistance services in the cost-sharing programs. However, both programs had identical limitations regarding payment for technical surgical assistance for surgeries performed in a teaching hospital. Because Sinai Hospital was a teaching hospital and had interns and residents, the claims were not reimbursable under either program without a certification by the surgeon in charge that the services of a resident, intern, or house officer was unavailable.[8]

---

[6] TSA benefits are payable when provided by an MD or DO; it may also be payable to a DDS or a DPM if the surgery falls within the scope of licensure. Blue Cross and Blue Shield of Michigan Physician's Manual, p 2-20, July, 1979.

[7] Physician's Manual, p CS-1, January, 1984.

[8] Although plaintiff asserted in the civil trial that the copayment program policy "superseded" the regular business program policy, the only support for this contention was a conclusionary response by Dr. Attenson to the following question that counsel represented had been asked at the criminal trial.

II

The criminal charges against Dr. Matthews were initiated by the Oakland County prosecutor following an investigation by the state police on the basis of information submitted by Dennis Drake, a Blue Cross and Blue Shield financial investigator. Mr. Drake's investigation of billing irregularities was precipitated by a call to the Blue Cross fraud hot line by LeAnne Pierce, a former employee of Dr. Matthews, who alleged that she had altered surgical reports while billing services for his dental practice. Drake completed an internal investigation that included a review of sixty technical surgical assistance claims submitted by Dr. Matthews,[9] consultation with Blue Cross consultants, and interviews with oral surgeons in the community. Drake then turned over his report to Detective Wayne Waldron of the Michigan State

---

*Q.* . . . Question: You'll agree, Doctor, that the later definition would supersede the previous definition, wouldn't you? It just stands to simple reason right? Answer: Right. [Question:] Was that the truth when you said it in 1988 at the trial in this case?

*A.* If I said it, it must be true.

Obviously, because plaintiff stipulated that the prosecutor had probable cause he did not contend that the 1984 definition authorized payment of these claims as a matter of law. The Blue Cross Physician's Manual describes different reimbursement policies and billing instructions for different programs such as regular business, cost sharing, and Medicare. Several Blue Cross employees and consultants testified that the regular business definition had not been changed or eliminated. The regular business definition of TSA was not eliminated and replaced by the subsequent definition. The regular business definition of TSA is still in place and has not changed since 1979. Plaintiff's assertion that the 1979 definition had been "superseded" is not supported by trial testimony or documentation in the manual.

[9] A Blue Cross audit of the five patient ledgers involved in the criminal charges did not reflect any involvement of surgery on the dates in question and failed to show any billings for consultation or TSA services that normally would appear on the billing ledgers.

Police. Waldron undertook a three-month indepen-
dent investigation in which he personally interviewed
Ms. Pierce, the employee who had alerted Blue Cross
to the existence of possible fraud; the five oral sur-
geons who had operated on the five patients for
whom Dr. Matthews claimed payment from Blue
Cross that became the basis for the criminal charges;
Dr. Jeffrey Topf,[10] chairman of Sinai Hospital's oral
surgery department; Dr. Byron Attenson, oral surgeon
and Blue Cross dental consultant; and Diane Freilich,
Dr. Matthews' attorney.

Pierce advised Waldron that she had falsified surgi-
cal reports to represent that Dr. Matthews had
assisted at surgeries. She stated that at Matthews'
direction, she had aligned his name on the operative
note directly below the operating physician's name,
using a special typing ball. Pierce then copied the
altered report and submitted it with the claim form to
Blue Cross for payment. Review of the hospital surgi-
cal register and copies of the reports on the five
patients identified in the charge revealed that Dr. Mat-
thews' name did not appear on any of the documents
as having been part of the original surgical team. Ms.
Pierce also told Waldron that the operative notes
were received from various oral surgeons' offices
because the hospital had refused to send them[11] and

---

[10] Dr. Topf was interviewed because he was the chairman of the oral
surgery department. He indicated that the hospital had no written policy
regarding TSA benefits and that he had never had any incidents where TSA
benefits were claimed. He further noted that there was no permission
needed for staff to be in the operating room and staff could attend sur-
gery at any time.

[11] Dr. MacIntosh stated in his interview with Detective Waldron that
two years before the investigation, he had a conversation with Dr. Mat-
thews about TSA fees. Dr. Matthews was told that surgical residents found

that Dr. Matthews personally reviewed all claims sent to Blue Cross for completeness.

Waldron interviewed Doctors William Aughton, Myron Kaufman, Jonathan Anderson, James Lepczyk, and Robert MacIntosh, each of whom told Waldron that they had not given Dr. Matthews permission to type his name on their surgical reports. Additionally the doctors provided information that 1) Dr. Matthews did not scrub or assist in performing the surgical operation, 2) Dr. Matthews stayed only for a short time during the lengthy surgery if he appeared at all,[12] 3) there was no valid medical reason for Dr. Matthews to be in the operating room, and 4) that most doctors were not aware that Dr. Matthews was billing for technical surgical assistance.

Waldron was also advised by Blue Cross consultant Dr. Attenson, that he had informed Dr. Matthews in July, 1984, that it was error for him to bill for technical surgical assistance because it required hands-on assistance, that at no time were payments for such benefits paid to orthodontists, that there was no medical reason for an orthodontist to be present at oral surgery, and that Dr. Matthews was the only orthodontist currently attending the surgeries and billing for such "assistance." Dr. Attenson also stated that because Sinai had interns and residents, oral surgeons on staff must use them for technical surgical

---

it improper for Dr. Matthews to request that they add his name to their surgical reports.

[12] A review of the Sinai Hospital surgical register and schedule of operations (surgery log) for the surgeries involved in the prosecution did not indicate Dr. Matthews' name on any of the documents. This confirms that there was no official hospital record verifying Dr. Matthews' attendance or assistance in any of the surgeries. Hospitals are required, as a matter of record, to document all those present and assisting in the operating room.

assistance and that where in-house assistance was not available for this service, lack of availability must be certified in writing and submitted with the claim for payment.

Dr. Matthews declined to be interviewed, and his attorney, Diane Freilich, responded to Waldron's questions on behalf of Dr. Matthews. She stated that Mr. Jack Hill, a Blue Cross employee, had furnished Dr. Matthews with a medical provider number and had told him how to apply for technical surgical assistance benefits. She maintained that Dr. Matthews was unaware of the Blue Cross definition of technical surgical assistance because he was never given a provider manual by Blue Cross and that he only billed technical surgical assistance on surgeries where he stayed for his part of the surgery, which lasted from one half to one hour and that if he just briefly stopped by he did not bill. Additionally she claimed that Dr. Matthews put his name on the surgical report because Blue Cross asked him to do so (although he could not remember who so advised him) and that there were other orthodontists claiming payment for technical surgical assistance in the area (although she could not provide their names). Attorney Freilich stated that Dr. Matthews also denied talking to any oral surgeons about filing technical surgical assistance fees on their cases and denied being told by Dr. Attenson not to claim technical surgical assistance benefits. Assistant Oakland County Prosecutor Ralph Charles Claus, Jr., authorized issuance of a warrant. Waldron signed and swore to the complaint, which was issued by an Oakland County judge.

III

Testimony at the preliminary examination basically replicated the information in Waldron's report.[13] The defendant was bound over for trial in circuit court.

---

[13] LeAnne Pierce described how the TSA claims were processed and how the operative reports were altered to represent Dr. Matthews' presence and that he assisted in the surgical procedure. Each claim form sent to Blue Cross for TSA, was accompanied by an altered operative report and a seven-point summary of Dr. Matthews' TSA services, which represented that Dr. Matthews "[w]as present in the OR and served as TSA during the entire surgical procedure." The individual patient's name was added to a prepared form copied on the doctor's letterhead. The form stated the following information.

For your records, in addition to the services mentioned in the Patient Operative Report, I provided the following:

1. Presurgical Study Models and Photographs, Diagnosis and Consultation.

2. Presurgical Series of Skull, Facial, and TMJ x-rays and complete Intermediate Examination.

3. Presurgical Consultation with Oral Surgeon[.]

4. Presurgical impressions and Articulator Mounting of the upper and lower models for the fabrication of the Surgical Splint. Also constructed and supervised the final adjustment of the Splint prior to active placement.

5. Preoperative Consultation with the patient at the Hospital, prior to surgery.

6. Was present in the OR and served as TSA during the entire surgical procedure. Determined the amount of bony advancement or retraction (and degree of surgical reduction genioplasty if necessary).

7. Complete Post-op Records.

These documents were attached together and mailed to Blue Cross after Dr. Matthews reviewed the claims for error.

The surgeons who had given statements to Detective Waldron testified in accord with the information that they had given Detective Waldron that resident doctors were available and assisted in each operation and that Dr. Matthews did not provide technical surgical assistance for the cases. Asked for a definition of technical surgical assistance, each doctor testified that technical surgical assistance had a commonly recognized meaning in the oral surgery community that required active participation in the surgical procedure.

Dr. Attenson reaffirmed the accuracy of the information he had given Waldron. Blue Cross representatives, John Gilsenan and Dr. Scott

A bench trial was held before the Honorable Frederick Ziem. The prosecution's proofs apparently consisted of testimony similar to that adduced at the preliminary examination, supplemented by that of additional witnesses. Dr. Matthews testified in his own defense, contending essentially that he lacked criminal intent to file false claims or to defraud. The trial judge denied Dr. Matthews' motion for a directed verdict of acquittal. The trial court found that guilt had not been established beyond a reasonable doubt and acquitted the defendant.

IV

Dr. Matthews filed the instant action of malicious prosecution against Blue Cross and Blue Shield. As far as can be determined, Dr. Matthews' theory of liability was that the agents of Blue Cross acted improperly because they had not informed the prosecutor that the cost-sharing programs did not include the word "active" in describing the policy concerning reimbursement for claims of technical surgical assistance. The trial court denied the defendant's motion for a directed verdict at the close of the proofs. The jury found in favor of Dr. Matthews and awarded

---

Navarro, acknowledged that dentists were eligible for TSA by licensure under the terms stated in the Blue Cross Physician's Manual, but that it was the credentials committee of the hospital that determines whether a doctor or dentist is eligible to participate in surgical procedures. Mr. Gilsenan stated that the Physician's Manual does not contain definitions of services per se, but descriptions of services that Blue Cross relies on to establish criterion for payment.

Jack Hill, a Blue Cross provider representative, testified that Dr. Matthews had not indicated any concern with TSA payments. Mr. Hill stated that Dr. Matthews was in possession of the Procedure Code Manual and the Physician's Manual and that he expressed concern about not receiving updates to the manual and he directed that updates be sent to him.

$1,275,000 in damages. The defendant's motion for judgment notwithstanding the verdict was denied.

The Court of Appeals affirmed. Unpublished opinion per curiam, issued April 13, 1995 (Docket No. 145934). We granted the defendant's application for leave to appeal "limited to whether there was a question of fact that required the issue of probable cause to be submitted to the jury." 453 Mich 960 (1996).

V

Probable cause involves a determination of both the historical facts and whether the rule of law as applied to the facts is violated. As the Supreme Court recently observed in the context of reviewing a question of reasonable suspicion or probable cause under the Fourth Amendment, "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." *Ornelas v United States*, 517 US 690, 699; 116 S Ct 1657; 134 L Ed 2d 911 (1996). Because the inquiry before us concerns a question of law, the existence of probable cause, our review is de novo.

A

Malicious prosecution is a tort that "runs counter to obvious policies of the law in favor of encouraging proceedings against those who are apparently guilty, and letting finished litigation remain undisturbed and unchallenged." Prosser & Keeton, Torts (5th ed), § 119, p 876. However, the interests of persons wrongfully prosecuted must also be protected. Balancing the interests involved, actions for malicious prosecution have historically been limited by restrictions that make them difficult to maintain. *Id. Renda*

*v Int'l Union, UAW*, 366 Mich 58, 75; 114 NW2d 343 (1962).

The plaintiff has the burden of proving (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. *Rivers v Ex-Cell-O Corp*, 100 Mich App 824, 832; 300 NW2d 420 (1980), citing *Weiden v Weiden*, 246 Mich 347, 352; 224 NW 345 (1929).[14]

B

Before turning to the issue of probable cause, we initially address several propositions advanced at trial and on appeal that seem to have obscured proper analysis of this case. In his opening statement, plaintiff's counsel maintained that there was an absence of probable cause to prosecute:

> Probable cause means that there is a reason to believe that someone has committed a crime, and that's a simplistic way of putting it, but I submit to you and will argue to you later, that you can't have probable cause if you don't make a full disclosure. If you don't tell the prosecuting authority all of the facts and give them the right definition, and if you distort what's being said, then you can't possibly have— have a reasoned decision being made by the prosecuting authority. So that's what happened here. There will be—we

---

[14] If probable cause is found, the actual motive behind the complaint may not be relevant because "[i]t is a recognized rule that malice may be inferred from want of probable cause, but this is not a rule that works both ways. Want of probable cause may not be inferred from malice." *Weiden, supra* at 352.

will show you an absence of probable cause because they
didn't make full disclosures and because the disclosures
that they made were untruthful. And I think I mentioned to
you that they ignored the court's order to produce exculpa-
tory information. . . . It shows that they intended to—to
prosecute this man without any regard to whether they
were bringing someone to justice.

However, the plaintiff's burden in a malicious pros-
ecution case is to make a prima facie showing that
the defendant's agents lacked probable cause to
believe that the plaintiff had committed a crime.
Whether the prosecutor might have made a different
decision is irrelevant to that issue.[15]

A public prosecutor is not liable for malicious pros-
ecution.[16] A plaintiff's prima facie case against a pri-
vate person requires proof that the private person
instituted or maintained the prosecution and that the
prosecutor acted on the basis of information submit-
ted by the private person that did not constitute prob-
able cause.[17]

Additionally, the plaintiff's contention that defend-
ant was obligated to make full and fair disclosure or
be liable for malicious prosecution confused the ele-
ments of plaintiff's prima facie case with the affirma-

---

[15] Counsel's statement was correct to the extent that counsel was argu-
ing that failure to disclose could be evidence of malice or that a defendant
who initiates a prosecution without probable cause cannot rely on the
prosecutor's legal advice if he concealed material facts.

[16] 3 Restatement Torts, 2d, § 653, comment e, p 408.
  The United States Supreme Court has recently reaffirmed this position,
holding that a prosecutor is fully protected by "absolute immu-
nity . . . when performing traditional functions" of an advocate, that is
preparation of the information and motion for arrest warrant, but is pro-
tected only by qualified immunity if the prosecutor is functioning as a
"complaining witness." *Kalina v Fletcher*, 522 US 118, __; 118 S Ct 502,
507-508; 139 L Ed 2d 471 (1997).

[17] 3 Restatement Torts, 2d, § 653(a), comments b and c, p 407.

tive defense of reliance on advice of an attorney. A private person who institutes or maintains a prosecution without probable cause may avoid liability on the ground that he instituted the prosecution at the direction or on the advice of the prosecutor, where he offers proof sufficient to permit a finding that he made a full and fair disclosure of the material facts.[18]

---

[18] 3 Restatement Torts, 2d, § 666, pp 433-434.

(1) The advice of an attorney at law admitted to practice and practicing in the state in which the proceedings are brought, whom the client has no reason to believe to have a personal interest in obtaining a conviction, is conclusive of the existence of probable cause for initiating criminal proceedings in reliance upon the advice if it is

(a) sought in good faith, and

(b) given after a full disclosure of the facts within the accuser's knowledge and information.

Comment:

(a) . . . This includes a prosecuting attorney. . . .

(b) . . . The advice of counsel is chiefly important in cases in which the criminal proceedings are initiated in the mistaken belief that the conduct of which the accuser reasonably believes the accused to have been guilty constitutes, as a matter of law, the crime charged in the proceedings.

In *Thompson v Price*, 100 Mich 558, 560-561; 59 NW 253 (1894), Price was the complainant on a warrant that charged Thompson with neglect of duty by failing to procure a property statement from a resident taxpayer. The only witness, aside from the plaintiff, who had any knowledge regarding whether the plaintiff had tried to obtain the statement was the taxpayer, Mr. Enos. Enos testified that he did not have any recollection that he had any conversations with Price regarding the statement. While the defendant offered testimony tending to show that Enos had told another person that he was not required to furnish a tax statement, there was nothing to substantiate that the defendant had spoken to Enos personally before making the complaint. The Court observed that it is correct that reliance is a complete defense to a claim of malicious prosecution if a defendant stated all the facts to the prosecuting attorney and acted on his advice in making the complaint.

Additionally, whether the failure to disclose information negates the defense of reliance on the prosecutor's determination of probable cause also requires the trial court to make a threshold determination regarding

This defense is simply not in issue unless the plaintiff makes out a prima facie case. Thus, unless the plaintiff presents a prima facie case that the private defendant instituted or maintained the criminal proceeding and that it was instituted or maintained without probable cause the question of the defendant's reliance on legal advice is immaterial.

Finally, and assuming arguendo that plaintiff's proofs make out a prima facie case, want of probable cause is a question of law to be determined by the court.[19] *Modla v Miller*, 344 Mich 21; 73 NW2d 220 (1955).[20] Where the facts on which the issue turns are

---

whether the allegedly withheld information has a material bearing on the existence of probable cause. As discussed below, Dr. Matthews was not entitled to payment under either Blue Cross program. The failure to alert the prosecutor that the word "active" did not appear in the copayment policy was not material.

[19] See 87 ALR2d 183, § 2, pp 186-187.

The rule that the question of probable cause in an action for malicious prosecution is for the court, and not for the jury, although undoubtedly anomalous in that it substitutes the judgment of the court for that of the jury as to the reasonableness of the defendant's conduct in the light of the admitted or established facts and beliefs, is nevertheless, except in a few jurisdictions, established, in theory at least, by the overwhelming weight of authority. The rule in its origin is probably traceable to the apprehension of the courts that if the question of probable cause were left to juries, they might not sufficiently safeguard the rights of defendants, and thus might discourage the performance of a public duty of bringing complaints against persons they believe to have committed offenses.

[20] It is necessary in actions for malicious prosecution for criminal proceedings "to carefully delineate the functions of judge and jury, particularly in determining probable cause." *Friedman v Dozorc*, 412 Mich 1, 77; 312 NW2d 585 (1981) (BLAIR MOODY, JR., J., dissenting in part).

"In actions for malicious prosecution, however, upon the [issue] of . . . probable cause, the jury has only the function of finding the circumstances under which the defendant acted. The court determines whether, under those circumstances . . . the defendant had or had not probable cause. If there is no conflict in the tes-

in dispute,[21] the question is for the jury. The jury resolves factual disputes regarding the circumstances under which the private person who initiates, procures, or maintains a prosecution might be found to have acted without probable cause. Whether the facts constitute probable cause is a matter for the court to determine.[22] *Koski v Vohs*, 426 Mich 424, 431; 395 NW2d 226 (1986).[23]

---

timony as to what the circumstances were, the court has no need for a finding of the jury. The jury is not called upon to act unless there is a conflict in the testimony that presents an issue of fact for its determination." [*Id.* at 77-78, quoting 3 Restatement Torts, 2d, § 673, comment e, pp 449-450.]

[21] If Drake testified that the basis for his action was that Pierce told him that Dr. Matthews directed her to alter the reports, but Pierce later testified that she told Drake that Dr. Matthews had no knowledge of the alteration of the records, the question whether Pierce or Drake was telling the truth would have been for the jury.

[22] In cases presenting a question of fact for jury determination, the preferred method for presenting the issue to the jury is suggested in *Friedman*, n 20 *supra* at 78, following the Restatement of Torts:

"The better . . . method [in determining the issue of probable cause] is to require the jury to find a special verdict setting forth the circumstances under which they find the proceedings were initiated. Upon these findings the court then determines whether the defendant had probable cause." [Quoting 3 Restatement Torts, 2d, § 673, comment e, pp 449-450.]

As Justice BLAIR MOODY, JR., stated, it is "the jury [that] resolves any conflict in the underlying facts on the issue of probable cause. Once the conflict is resolved, the judge determines whether the facts as found by the jury constitute probable cause. If the facts underlying . . . reasonable belief are not in dispute, the judge decides the issue of probable cause." We agree and find the Restatement approach preferable because it allows the jury to focus on the factual determination without worrying about how the law is to be applied. Where there is a disputed question of fact in a malicious prosecution case, the jury should determine the facts on a special verdict form and the judge should, on the basis of those facts, make the ultimate determination of probable cause as a matter of law.

[23] See 3 Restatement Torts, 2d, § 673, pp 448-449:

(1) In an action for malicious prosecution the court determines whether

C

Although further discussion of the first and third observations is unnecessary, additional explanation is in order regarding the plaintiff's obligation to show that the defendant initiated, continued, or maintained the prosecution and that probable cause is a question of law. We discuss them seriatim.

The plaintiff failed to show that defendant's agents instituted the proceeding or maintained it.[24] The prosecutor authorized the warrant, and Detective Waldron

---

(a) the proceedings of which the plaintiff complains were criminal in character;

(b) the proceedings were terminated in favor of the plaintiff;

(c) the defendant had probable cause for initiating or continuing the proceedings;

(d) the harm suffered by the plaintiff is a proper element for the jury to consider in assessing damages.

(2) In an action for malicious prosecution, subject to the control of the court, the jury determines

(a) the circumstances under which the proceedings were initiated in so far as this determination may be necessary to enable the court to determine whether the defendant had probable cause for initiating or continuing the proceedings;

(b) whether the defendant acted primarily for a purpose other than that of bringing an offender to justice;

(c) the circumstances under which the proceedings were terminated;

(d) the amount that the plaintiff is entitled to receive as damages;

(e) whether punitive damages are to be awarded, and if so, their amount.

[24] Plaintiff appears to contend that Drake initiated the prosecution or that he procured and maintained it because of his continued involvement throughout the case. The first proposition is incorrect as a matter of law because initiation of the prosecution is at the exclusive discretion of the prosecutor. There was no evidence of inducement or pressure or any infringement on the prosecutor's authority in bringing or continuing the prosecution.

We employ the terms "continued or maintained" throughout this opinion in accord with the concept of "continues" as expressed in 3 Restatement Torts, 2d, § 662, p 423.

was the complainant. The warrant request was based on Waldron's independent investigation, not on the information the defendant's agent submitted. As the chief law enforcement officer of the county, a prosecutor has independent authority to initiate criminal prosecutions. MCL 764.1; MSA 28.860. A warrant may not be issued without the prosecutor's written authorization unless security for costs is given. *Bloss v Williams*, 15 Mich App 228, 233; 166 NW2d 520 (1968).[25] Thus, in Michigan, the prosecutor's exercise of his independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution. *Christy v Rice*, 152 Mich 563, 565; 116 NW 200 (1908).[26]

---

One who initiates or continues criminal proceedings against another has probable cause for doing so if he correctly or reasonably believes

(a) that the person whom he accuses has acted or failed to act in a particular manner, and

(b) that those acts or omissions constitute the offense that he charges against the accused, and

(c) that he is sufficiently informed as to the law and the facts to justify him in initiating or continuing the prosecution.

See comment on clause a:

It is the facts known or reasonably believed by the private prosecutor that determine the existence or non-existence of probable cause and not the facts which, although within the knowledge of third persons, are not communicated to him. If, in the light of the facts as he knows or reasonably believes them to be, a reasonable man would believe that the conduct of the accused was such as to make him guilty of the offense charged against him, the existence of exonerating facts is immaterial unless those facts would have been disclosed by such an investigation as the prosecutor should have made before initiating the proceedings. [*Id.* at 424-425.]

There was no evidence of inducement or pressure or any infringement on the prosecutor's authority in bringing or continuing the prosecution.

[25] See *People v Carter*, 379 Mich 24; 148 NW2d 860 (1967).

[26] See *Smith v Austin*, 49 Mich 286; 13 NW 593 (1882).

In *Christy*, the Court held that the trial judge erred in refusing to direct a verdict where the prosecutor conducted "his own investigation, and acted in his official capacity upon that investigation, independent of defendant's statement." *Id.* at 567-568. Unless the information furnished was known by the giver to be false and *was the information on which the prosecutor acted*, the private person has not procured the prosecution.[27]

In *Renda v Int'l Union, UAW, supra*, the Court concluded that the trial judge erred in charging the jury that it could find liability if it found that the defendants were the "proximate cause," *id.* at 91, of the prosecution, in the sense that the prosecution was a natural and probable consequence of an agreement between the private persons and an informer to pay the informer for his testimony and in refusing to charge that if the prosecutor acted on his own judgment the verdict must be for the defendants. We held

---

[27] 3 Restatement Torts, 2d, § 653, comment g, p 409  states

A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in this Section even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

that there was a total lack of evidence that the defendants by improper pressure or inducement[28] on the prosecutor succeeded in securing the warrant for the plaintiff's arrest and that the prosecution came into being after the prosecutor's interview and investigation of the informant.

*Christy* and *Renda* confirm two long-established rules that negate an element of plaintiff's prima facie case. The independent exercise of prosecutorial discretion establishes that the private defendant did not initiate the prosecution. The prosecutor's independent investigation is not in law attributable to the private defendants. The information developed by Officer Waldron was submitted to the prosecutor who authorized issuance of a warrant on grounds that established probable cause to believe that Dr. Matthews had committed a felony. Thus, Blue Cross did not initiate or maintain the prosecution as a matter of law.

Finally, there was no disputed issue of material fact regarding the existence of probable cause. A private person's mistake of fact or law is relevant to whether he acted reasonably in initiating or maintaining a criminal proceeding.[29] However, as noted, defendant did not initiate, continue, or maintain the prosecution.[30] Because there was no basis for disputing that

---

[28] For example, if the criminal law is used for "some collateral or private purpose, such as to compel the delivery of property or payment of a debt rather than to vindicate the law, he is guilty of a misuse of process and a fraud upon the law." *Hall v American Investment Co*, 241 Mich 349, 353; 217 NW 18 (1928).

[29] 3 Restatement Torts, 2d, § 662, pp 424-428.

[30] If the defendant merely states what is believed, leaving the decision to prosecute entirely to the uncontrolled discretion of the officer, or if the officer makes an independent investigation [the defendant] is not regarded as having instigated the proceeding. [Prosser & Keeton, Torts (5th ed), § 119, pp 872-873.]

there was probable cause for the prosecution, the trial court should have resolved the question as a matter of law.[31]

## VI

In *Koski, supra* at 432, we recognized that the question of probable cause is an objective test[32] that "involves only the conduct of a reasonable man under the circumstances." The cause by which a criminal proceeding is initiated, is objectively measured. "In so doing, it was correct to view the facts, not as a legal technician would view them, but as the prudent, cautious person would see the situation."[33] *Id.* In *Wilson v Bowen*, 64 Mich 133, 138; 31 NW 81 (1887), we observed:

"To constitute probable cause . . . , there must be such reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offense charged.

---

[31] 3 Restatement Torts, 2d, § 653, p 406.

[32] Commentators support this view and have been critical of injecting a subjective element into a probable cause determination. See Dobbs, *Belief and doubt in malicious prosecution and libel*, 21 Ariz L R 607, 609-610 (1979), and note, *Changing the standards of probable cause in malicious prosecution*, Bradshaw v State Farm Mutual Automobile Insurance Co, *157 Ariz 411; 758 P2d 1313 (1988)*, 21 Ariz St L J 1231(1989).

[33] The United States Supreme Court has recently stated in this regard that "[a]rticulating precisely what . . . 'probable cause' mean[s] is not possible. [It is a] commonsense, nontechnical conception[] that deal[s] with ' "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" ' [and] [a]s such, the standards are 'not readily, or even usefully, reduced to a neat set of legal rules.' . . . We have cautioned that [this] legal principle[] [is] not [a] 'finely-tuned standard[]' comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence. [It is] instead [a] fluid concept[] that take[s] [its] substantive content from the particular contexts in which the standards are being assessed." *Ornelas, supra* at 695-696.

> "A person may have probable cause for making a criminal complaint from information received from others merely; but in such case, he must honestly believe the information there obtained to be true, and the information must be of that character, and obtained from such sources, that business men generally, of ordinary care, prudence, and discretion, would act upon it under such circumstances, believing it to be reliable. But a man's mere belief that another is guilty is not probable cause, unless that belief is founded upon reasonable grounds of suspicion, or upon information of such a reliable kind, and from such reliable sources . . . such as would induce an impartial and reasonable mind to believe in the guilt of the accused."

Dennis Drake's report to the state police was based on information from reliable sources, namely operating surgeons. The doctors' statements that plaintiff's assistance was not medically necessary and that none of them authorized him to represent that he provided surgical assistance corroborated the allegation of improper billing made by LeAnne Pierce. It was information that would cause a reasonable mind to believe in the guilt of the accused. Thus, assuming arguendo that there was evidence Drake initiated or maintained the prosecution, taken in the light most favorable to the plaintiff, there is simply no basis to conclude that a reasonable person would not have believed that Dr. Matthews probably had submitted false claims.[34]

Plaintiff's argument that lack of full and fair disclosure of a material fact, that fact being the policy regarding payment for technical surgical assistance under the copayment programs, is inapposite to

---

[34] See Proposed Rule of Criminal Procedure 6.107(E). 422A Mich 33. The subrule is consistent with FR Crim P 5.1(a)  and with the great weight of state authority requiring probable cause with respect to both the offense and the defendant.

whether plaintiff's proofs made out a prima facie case of the absence of probable cause. Plaintiff's burden was to show that defendant instigated the investigation or continued it and that the prosecution was based on false information.[35] Under these circumstances, there was no disputed issue of fact that technical surgical assistance was not reimbursable at Sinai Hospital.

In *King v Arbic*, 159 Mich App 452, 466; 406 NW2d 852 (1987), the plaintiff filed a malicious prosecution claim against the state trooper who had signed the complaint against the defendant. The Court of Appeals upheld the trial court's grant of summary disposition, observing that the "[d]efendant has invoked a traditional defense to malicious prosecution, namely, the defense of advice of counsel." The Court of Appeals adopted the opinion of the trial court, which recognized:

> In cases similar to the one we are faced with here, that legal principle reduces to the following rule: ". . . the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to false facts in a complaint, without which there is no probable cause." *Belt v Ritter*, 18 Mich App [495] 503 [171 NW2d 581 (1969)]. The argument supported by that rule is sometimes characterized as an attack on the first ele-

---

[35] See *Hall v American Investment Co*, n 28 *supra* at 354-355.

The rule is generally accepted that in determining whether there was probable cause for the institution of a criminal prosecution, only those facts and circumstances as were known to the complainant at the time of instituting the criminal prosecution are to be considered, and not facts which subsequently appeared. The inquiry as to probable cause goes back to the commencement of the criminal prosecution, and it relates to facts then known as they then appeared.

ment of the cause of action, that defendant instituted the previous prosecution. Alternatively, there is a good deal of case literature which views the defense as an attack on the "lack of probable cause" prong. This Court is in agreement with the Court of Appeals decision in *Wilson v Yono*, 65 Mich App 441, 444 [237 NW2d 494] (1975), which said, "[a]lthough the cases seem to talk in terms of probable cause, it is clear that the rule is based upon the idea that defendant has not in fact instituted the prosecution." (Emphasis added.) See also *Rivers v Ex-Cell-O Corp*, 100 Mich App 824, 832-833; 300 NW2d 420 (1980).

In the final analysis then, we are brought back, quite conveniently, to a question which has already been addressed in this opinion, albeit in slightly different form. The question is this: Is there any evidence in the record, as it exists, which would give rise to the inference that defendant Arbic knowingly included false facts in his incident report, without which the prosecutor could not have concluded there was probable cause? The answer is clearly no. This question is a slightly different form of the one answered earlier regarding defendant's lack of good faith. It has never been pled or argued by plaintiff that defendant did anything worse than fail to include certain arguably exculpatory items. In fact, those items which plaintiff has consistently labeled as "exculpatory" (i.e. that it was dark, that the victim only saw part of his assailant's legs, etc.), are not really exculpatory in nature. An exculpatory fact would be something such as an eye witness who saw plaintiff elsewhere or the fact that plaintiff had a broken ankle on the night in question. See, e.g., *Rivers, supra*, pp 832-833. While the distinction is concededly a fine one, plaintiff is really arguing certain ameliorating circumstances, not exculpatory facts. This court has determined that it would place too much of a burden upon investigating police officers to require that they include all possibly mitigating items in their police reports in order to avoid potential liability. [*Id.* at 466-467.]

Simply stated, Dr. Matthews' contention that the claims were reimbursable under the copayment pro-

grams was, at best, a mitigating or ameliorating circumstance.

Because it was undisputed that Sinai Hospital is a teaching facility and that reimbursement for technical surgical assistance was not available under either the regular business program or the copayment programs unless the operating surgeon certified the unavailability of an "in-house" assistant, there was no nondisclosure of information that was material, and no disputed fact regarding the information on which the prosecutor relied to make his independent determination of probable cause. There being no evidence negating the existence of defendant's reasonable belief that Dr. Matthews had submitted claims for reimbursement to which he was not entitled, the trial court erred in submitting the issue of probable cause to the jury and denying defendant's motion for a directed verdict.

## CONCLUSION

Blue Cross clearly had probable cause to believe that Dr. Matthews had probably made false claims for reimbursement.[36] The fact that Blue Cross was aware

---

[36] 3 Restatement Torts, 2d, § 672(2), p 446 establishes that "[i]n an action for malicious prosecution, the defendant has the burden of proving, when the issue is properly raised, that the plaintiff was guilty of the crime charged against him."

Comment on subsection 2, p 448.

(i) The rule under which the defendant can protect himself from liability by proving that the plaintiff was guilty of the crime charged against him is stated in § 657.

Comment on § 657, p 416.

b. . . . Under the rule stated in this Section proof of the guilt of the person against whom the proceedings were instituted is a complete defense to a suit against the person who initiated them. In

that a policy under the copayment programs deleted the word "active," might constitute an ameliorating circumstance bearing on whether Dr. Matthews had fraudulent intent, but it does not make false the fact that the plaintiff made claims for payment that were not reimbursable under any definition. The alteration of the surgical records was itself sufficient to raise the suspicions of any prudent businessperson. Combined with advice from the oral surgeons that Dr. Matthews provided no services and did not have their permission to make a contrary representation, a reasonable person would have concluded that Dr. Matthews probably had committed a felony. There was no evidence that the prosecution was initiated other than at the sole discretion of the prosecutor on the basis of an independent investigation. We reverse the decisions of the trial court and the Court of Appeals and remand the case for entry of judgment notwithstanding the verdict.

MALLETT, C.J., and BRICKLEY, WEAVER, KELLY, and TAYLOR, JJ., concurred with BOYLE, J.

CAVANAGH, J. (*concurring*). Because the evidence supported Blue Cross and Blue Shield's assertion that Dr. Matthews was improperly billing technical surgical assistance at a teaching hospital, as that term is defined in either the 1979 or the 1984 Physician's

---

order to avail himself of this defense, the latter person must prove that the accused was guilty of the crime charged against him. To sustain this burden, however, he is not required to establish the guilt of the accused beyond a reasonable doubt. It is enough that all the evidence produced at the trial shows a preponderating probability of his guilt.

Manual, I concur in the result reached by the majority.

At the civil trial, Officer Rumbly was asked whether finding out about the 1984 definition caused him to question whether the police had a case against Dr. Matthews. He answered, "Well, at the time that it came out, obviously I wanted to know exactly what the definition was, and where it was, and why it wasn't in my file. However, given the other evidence in the case, it did not cause me any hesitation in terms of the issue of probable cause . . . ." When asked what those other factors were, and what was argued in the criminal trial, Rumbly replied:

> The defendant was charged with having submitted false health care claims to Blue Cross and Blue Shield. . . . Our theory of the case is that the defendant was not entitled to be paid for the benefit of having acted as a technical surgical assistant. It went beyond the definition to the extent that either definition existed, there were conditions that were attached to that definition. Now, I can't recite them word for word, but there were conditions that existed because of the fact that these procedures took place in what Blue Cross defined as a teaching hospital. It was at Sinai Hospital. Because that was a teaching hospital, there had to be some certification that at the time of the procedure, there was no intern or resident available to assist the surgeon who was in charge of the procedure before this provider, Dr. Matthews, could claim the benefit of TSA. There was no evidence to indicate that at any time, anybody ever certified that there was a resident or intern unavailable. That was one item.

On the basis of this factor, specifically relied on by both Blue Cross and the prosecutors, I find that probable cause existed to bring charges against Dr. Matthews for improper billing practices. I do not express

any opinion regarding the other matters raised in the majority opinion.