**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0102n.06

No. 11-1653

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jan 29, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN H. AUTREY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Detroit Police Commander BRIAN R. | ) | EASTERN DISTRICT OF MICHIGAN |
| STAIR, Detroit Police Sergeant JOHN F. | ) | |
| KENNEDY, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: GUY, DAUGHTREY and STRANCH, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff John Autrey, a former

commander in the Detroit Police Department, filed this § 1983 action[1] charging the City of

Detroit and numerous police officials with wrongful arrest and malicious prosecution, as

well as liability for state-law torts of gross negligence and malicious prosecution.

Ultimately, Autrey voluntarily dismissed all claims against the City, the chief of police, the

assistant chief of police, the deputy chief of police, and an additional police officer. The

district court, relying upon the preclusive effect of a state-court judge's prior finding of

probable cause to bind Autrey over for trial, then granted summary judgment to the

---

[1]*See* 42 U.S.C. § 1983.

remaining defendants, Commander Brian Stair and Sergeant John F. Kennedy, on the plaintiff's claims.

Autrey now appeals the order of summary judgment, alleging that principles of collateral estoppel were improperly applied to prevent him from relitigating the state court's probable-cause determination. He also contends that genuine disputes of material fact militate against a grant of summary judgment in favor of the defendants.[2] For the reasons set out below, we conclude that the district court properly relied on collateral estoppel to foreclose Autrey's claims against Stair and Kennedy, and we therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 2:00 a.m. on Saturday, April 28, 2007, Officer Carl Chuney of the Detroit Police Department responded to a report of an automobile accident. Upon arriving at the scene, Chuney learned that one of the vehicles involved in the collision was an unmarked car registered to the Detroit Police Department. Chuney quickly ascertained that the city-owned vehicle had been driven by Todd Bettison, a Detroit police commander and close friend and campaign fundraiser for then-mayor Kwame Kilpatrick.

As part of his investigation of the accident scene, Chuney "evaluated" the vehicle, "surveying it inside and outside, finding out if there was alcohol involved or determining

---

[2]The plaintiff further contends that there is no merit to the defendants' requests for qualified immunity or to their argument that his state malicious-prosecution claim is barred by the statute of limitations. In view of our ruling on the question of collateral estoppel, we need not address these issues.

how the accident occurred." In doing so, Chuney observed an empty Sutter Home wine-cooler bottle on the passenger side of the automobile and "[t]hree empty matching bottles on the outside of the driver's side door." Rather than fill out an accident report at that time noting his observations, Chuney deferred to other police officials who later arrived at the scene. Chuney did, however, discuss with those other individuals – Commander John Serda, Sergeant Stevie Hayes, and Officer Darrell Osborne – the wine-cooler bottles he saw both inside and outside Commander Bettison's vehicle.

Chuney, along with three other police officers, rerouted traffic around the accident scene before contacting Sergeant Hayes, Chuney's patrol supervisor. When Hayes arrived on the scene shortly thereafter, he did not feel that it was necessary to take additional actions to preserve the wine-cooler bottles in evidence "[b]ecause the scene [was] already maintained. Tape was already around it so it wasn't going anywhere." When Hayes reported his observations by phone to the lieutenant who was in charge of the district desk that morning, the lieutenant directed him to leave the scene of the accident and to accompany Bettison to a local hospital.

While Hayes was en route to the hospital, numerous phone calls were made and messages left up and down the relevant chains of command within the police department, indicating that a police commander had been involved in a car accident and that alcohol might have been a contributing factor in the crash. Eventually, Hayes, Deputy Chief Chester Logan, Commander Serda, and the plaintiff convened at the hospital to which

Bettison had been taken. Although Hayes claimed that he did not, at that time, report to his cohorts at the hospital that he had seen alcohol bottles at the scene of the accident, Serda told Deputy Chief Logan that he (Serda) had been informed by phone by the lieutenant in charge of the district desk that there was a "possibility that alcohol had been involved in the accident."

As a result, Logan directed Serda to evaluate the situation at the site of the accident. Upon his arrival at the scene, Serda noted that the area around the crash site had been blocked off by two marked scout cars. He also observed that the entire accident area had been outlined with yellow crime-scene tape. Although there was no such tape around the empty wine-cooler bottles themselves, Serda explained that the crime tape at the intersection "secured the scene." The commander then returned to the hospital to inform Deputy Chief Logan of his observations.

While Serda was away from the hospital, Logan and Autrey attempted to speak with Bettison, but were unable to do so because the injured commander was sedated and unconscious. Nevertheless, Autrey and Logan learned from the emergency-room doctor that Bettison "obviously had been drinking and it was obviously over the legal limit."

At approximately 4:15 that morning, Autrey, Logan, and Serda finally left the hospital. Autrey claimed that prior to their departure, Logan announced, "Internal Affairs is not coming out. We can all go home." The plaintiff further indicated that Logan stated that the accident site "was no longer a crime scene." Despite being told that "[w]e can all

- 4 -

go home," Autrey decided to drive by the scene of the accident to see whether "there is [sic] some other personal items that are inside the car that [Bettison] had." Even though the plaintiff noticed two marked police vehicles continuing to block the road when he arrived at the site at approximately 4:30 a.m., Autrey intimated that no police tape surrounded the area, lending some credence to Logan's prior pronouncement that the area was no longer a crime scene.

In light of his understanding that no further investigations would be undertaken, Autrey then approached Bettison's car and removed a child's car seat and a flashlight from the vehicle. He also placed the empty wine-cooler bottles and some empty aluminum drink cans into a plastic bag and stowed the items in the trunk of his own car. After visiting the site of two other nearby incidents, Autrey then drove to the police station and placed the bag containing the wine-cooler bottles in a dumpster.

Despite Deputy Chief Logan's alleged announcement at the hospital that officers from Internal Affairs would not be examining the crash site, Sergeant Kennedy, then of the Internal Affairs Division, did in fact arrive at the scene after receiving a telephone call from Commander Stair sometime between 5:00 a.m. and 6:00 a.m. on April 28, 2007. By that time, Autrey had already left the scene of the crash and had taken with him the four wine-cooler bottles found in or near Bettison's vehicle. Kennedy testified during his deposition that, upon his arrival, he also did not see crime-scene tape in the area; however, he did explain that, "when [he] arrived, the tow truck was getting ready to take the vehicle. So it

may have been up and they had taken it down." Prior to the departure of the tow truck however, Kennedy examined the interior of the car and "saw a top to what appeared to be some type of alcoholic beverage bottle with the letters 'S,' 'H' on top of it." Based on the results of his investigation, Kennedy then served an investigative subpoena to the hospital that treated Bettison and discovered that the injured commander had a blood alcohol level of .22, well over the legal limit. (Bettison himself later admitted that, prior to the accident, he had consumed at least two Long Island iced teas and "a couple tequila shots," in addition to the four wine coolers.)

On the Monday morning after Bettison's Saturday accident, the law enforcement officials involved in the investigation were asked by Internal Affairs to prepare their reports of the incident. From those reports, Kennedy then developed his own investigation report, the first draft of which did not request the prosecutor to bring charges against Autrey. According to Kennedy, the reason that he did not initially seek to hold Autrey criminally liable for the disposition of potential evidence was his belief that the wine-cooler bottles were not needed in any prosecution of Bettison "because the blood alcohol level was so high." Nevertheless, as a result of later discussions between Kennedy and Internal Affairs Commander Stair, the two men concluded "that Commander Autrey did remove bottles from the vehicle and discard the bottles, [necessitating that Kennedy] type up an Investigator's Report in relationship to that as well." An amended investigator's report was thus prepared by Kennedy and reviewed by Stair, and signed by Lieutenant Whitney

Walton on Stair's behalf on June 8, 2007, recommending that the prosecutor charge Autrey with misconduct in office, tampering with evidence, and neglect of duty.

Kennedy then presented to Robert Donaldson, an assistant prosecuting attorney, a packet of materials that included the investigator's report, copies of interviews with witness officers, "the interoffice memorandum that was prepared by commander, former Commander Autrey, the accident report[,] and whatever relative [sic] information regarding this matter would've been in the report." Donaldson, after reviewing the materials, approved the recommendation to charge Autrey under Michigan Compiled Laws Annotated § 750.505 with misconduct in office, under § 750.483a(5)(a) with tampering with evidence, and under § 750.478 with neglect of duty by a public officer. In doing so, however, the prosecutor specifically informed Stair that "[h]e didn't want to know what [Autrey's] statement was. He didn't want it included in his file or any mention of it in the investigator's report . . . to create that firewall so that there are no *Garrity* issues[3] in the trial."

Eventually, a Michigan state-court judge conducted a preliminary examination in the prosecution of Autrey. At that proceeding, testimony was offered regarding the fact that Autrey removed wine-cooler bottles from the accident scene and disposed of them.

---

[3]In *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), the United States Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *See also McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005) ("As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation.").

Furthermore, Deputy Chief Logan testified, contrary to the plaintiff's assertions on appeal, that he did *not* "advise Commander Autrey and/or Commander Serda that Internal Affairs was not going to come out to the scene and that we can all go home now." At the conclusion of the testimony at the preliminary examination, the judge found that "there [wa]s probable cause to believe the offenses charged in the Complaint and Warrant were committed, likewise the defendant herein committed the offenses." The judge thus bound the matter over for trial.

The actual trial extended over two days, and on January 16, 2008, the jury unanimously found Autrey not guilty on each of the three counts. Having received that favorable verdict, the plaintiff filed a § 1983 complaint in federal district court on January 14, 2010, alleging that the City of Detroit itself and six individual police officials each acted under color of state law to deprive him of his federal constitutional right to be free from unreasonable searches and seizures and his right not to be deprived of liberty or property without due process of law. In additional counts, the plaintiff also alleged that the defendants were grossly negligent in the performance of their duties and that the defendants were liable to Autrey under both federal constitutional law and under state tort law for prosecuting him "with malice or a primary purpose other than that of bringing the true offender to justice."

The parties then engaged in extensive discovery before the defendants filed a joint motion for summary judgment in their favor on all claims raised by Autrey. Prior to the

resolution of that motion, the plaintiff voluntarily dismissed his claims against the City of Detroit, and against certain police officials, leaving only Sergeant John Kennedy and Commander Brian Stair as parties-defendant.

In addressing the summary judgment motion, the district court recognized that Autrey could prevail on his claims of malicious prosecution and his Fourth Amendment claim of wrongful arrest only if the plaintiff could somehow establish that no probable cause for his prosecution had been established. Because a state-court judge had already determined that probable cause existed to bind Autrey over for trial, however, the district court determined that principles of collateral estoppel precluded the plaintiff from pursuing a second time an identical challenge to the quantum of evidence necessary to initiate a criminal prosecution. Additionally concluding that the plaintiff failed to make any showing "that Kennedy and Stair provided false information or failed to provide material exculpatory information to the assistant prosecutor," the district court ruled that summary judgment in favor of the defendants was proper. Autrey now appeals from that determination.

## DISCUSSION

We review *de novo* the grant of summary judgment by a district court. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and

construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *See Ciminillo*, 434 F.3d at 464.

Before this court, the plaintiff first argues that the finding of probable cause by the state judge at the preliminary-examination stage of the criminal proceedings should not affect the federal courts' decisions regarding the merits of his claims of wrongful arrest and malicious prosecution.[4] He does so even though each of those later claims contains, as an element, the lack of probable cause to pursue the particular action. *See, e.g.*, *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (wrongful arrest) (holding that the Fourth Amendment requires a finding of probable cause as a condition for any significant pretrial restraint of liberty); *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (malicious prosecution under the Fourth Amendment) (holding that "the plaintiff must show that there was a lack of probable cause for the criminal prosecution"); *Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 610 (Mich. 1998) (Michigan tort of malicious prosecution) (holding that the plaintiff must show that the person instituting or maintaining the prosecution lacked probable cause for bringing the action).

---

[4]Although Autrey's complaint also raised allegations of gross negligence on the part of the defendants in their performance of their law-enforcement duties, his appellate briefs neither allude to nor develop an argument relating to such a negligence cause of action. Autrey's conscious abandonment of this issue thus results in waiver of that claim, which is not now reviewable even for plain error. *See United States v. Branham*, 97 F.3d 835, 842 (6th Cir. 1996).

When deciding what role the Michigan state court's preliminary-examination determination of probable cause should have in Autrey's § 1983 action, we must "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)). Consequently, the threshold question to be resolved in this appeal is whether rules of collateral estoppel applied in Michigan state courts would foreclose a litigant in a later-filed civil action from challenging a finding of probable cause previously made in a preliminary hearing during a criminal prosecution.

As a general rule, Michigan courts will apply collateral estoppel when: "(1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties . . . had a full [and fair] opportunity to litigate the issue; and (3) there [is] mutuality of estoppel." *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845-46 (Mich. 2004) (citation, footnote, and internal quotation marks omitted). However, mutuality of estoppel is "not required when collateral estoppel [is] being used defensively," *Gilbert v. Ferry*, 413 F.3d 578, 581 (6th Cir. 2005) (*per curiam*) (citing *Monat*, 677 N.W.2d at 850).

Thus, when collateral estoppel "is asserted defensively to prevent a party from relitigating an issue that such party has already had a full and fair opportunity to litigate in a prior suit," *Monat*, 677 N.W.2d at 850, the elements of the Michigan law of issue preclusion may be further distilled. As the Sixth Circuit has noted, when arguing for the

application of defensive collateral estoppel in Michigan courts, the party seeking to accord

preclusive effect to a prior court determination must establish that:

> 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 452

N.W.2d 627, 630-31 (Mich. 1990)).

In this appeal, Autrey cannot honestly dispute the applicability of the first two

elements of the collateral estoppel decisional framework. He does, however, contend

before this court that the issue that was resolved in the state-court probable-cause hearing

is not the same issue that is now disputed in his § 1983 litigation. Furthermore, the plaintiff

insists that he did not receive a "full and fair opportunity to litigate the [probable cause]

issue in the earlier proceeding." Autrey's contentions are, however, based upon

misapprehension not only of the law, but also of the nature of the various decisional

settings as well.

In arguing that collateral estoppel should not be applied to his § 1983 action, Autrey

contends, "First, the probable cause determination at the state preliminary exam was not

essential to the eventual trial judgment that Commander Autrey was not guilty. In fact, the

probable cause determination was totally irrelevant to the judgment entered in favor of

Commander Autrey at trial." These statements made by the plaintiff in his appellate brief are no doubt true. The mere determination by a judicial official that probable cause exists to believe that a criminal offense has been committed and that a specified individual committed that offense is, of course, not equivalent to – and not relevant to – the ultimate determination of whether the individual is guilty of the charged offense beyond a reasonable doubt. Autrey's recitation of such an axiom is, however, equally irrelevant to the resolution of the question whether a judicial determination of probable cause that a person committed an offense is equivalent to a subsequent determination in a civil action that law enforcement officials and prosecutors also had probable cause to initiate criminal proceedings against that person in the first place.

The very formulation of the inquiry seems to suggest the only possible answer. Despite the fact that the two probable cause determinations appear co-extensive, however, Sixth Circuit jurisprudence has necessarily recognized that a state-court determination of probable cause at a preliminary hearing sometimes may not encompass determinative issues advanced in subsequent proceedings seeking monetary damages for false arrest or malicious prosecution. In fact, such civil litigation can involve questions of whether officers made materially false statements or omitted crucial information when presenting their cases to a prosecutor, questions that are not necessarily at issue in preliminary

hearings.  *See Darrah*, 255 F.3d at 311.[5]  To the extent that a plaintiff in a § 1983 cause of action can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's probable-cause determination, there is no requirement that the initial finding be given preclusive effect in the federal-court action.  Autrey seeks to advance just such claims in this appeal.

Nevertheless, the mere allegation that false information was offered by the police or that material evidence was withheld from the prosecutor does not necessarily make such a statement true or even create a dispute of material fact for jury resolution.  Indeed, in this case, the plaintiff goes to great lengths to argue that Kennedy and Stair provided false information to the prosecutor and also withheld crucial evidence from the prosecutor so as to intimate that the decision to bind Autrey over for trial was not based upon a complete understanding of the occurrences in the early morning hours of April 28, 2007. Those efforts, however, do not come close to creating the dispute Autrey asks this court to believe they do.

The plaintiff's assertion that defendants Kennedy and Stair omitted key information in their investigative report to the prosecutor is either a conclusion not borne out by the

---

[5] *Darrah* was the subject of criticism in *Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002), in which the court said that it "frankly [found] the logic of *Darrah*'s collateral-estoppel holding questionable.  A state court judge ruling on the presence or absence of probable cause in a criminal action must necessarily take into consideration the veracity of the officers' statements."  The *Hinchman* court nevertheless adhered to the precedent established in *Darrah*.  *Id.* at 203.

appellate record or a mischaracterization of uncontroverted deposition testimony. In his

brief before this court, Autrey claims:

> Kennedy submitted a warrant request totally devoid of any information other than that which would lead the prosecutor to file charges. No exculpatory information of any sort was included: Nothing was included about the Serda's [sic] decision to stop all notification and reports; nothing was included about the IA Alert Team not being notified for over two hours; nothing was included about the accident site not being treated as a police scene for over two hours, and more particularly, not being treated that way at the time Autrey picked up the garbage, child seat and bottles. Kennedy knew he had a duty to include all exculpatory information to the prosecutor. Stair, who also knew he had a duty to include full details including any exculpatory information in the warrant request, signed off on Kennedy's request and Kennedy took it to Donaldson.

The only evidence in the record, however, paints a very different picture from the

one Autrey would have us accept. First, the appellate record contains absolutely no

information from which we could conclude that exculpatory information was intentionally

excluded from the packet of information provided to the prosecutor. During his deposition

testimony, for example, Stair candidly admitted:

> Prior to submitting this investigator's report, I had several conversations with the Wayne County Prosecutor Bob Donaldson as to what was there, the fact that Commander Autrey had made a statement. He didn't want to know what the statement was. He didn't want it included in his file or any mention of it in the investigator's report, so, you know, to create that firewall so that there are no *Garrity* issues in the trial.

Nevertheless, Stair and Kennedy did note in the amended investigator's report that evidence considered by them included an "Inter-Office Memorandum prepared by the defendant."

Furthermore, Kennedy stated in his deposition that he personally delivered a packet of information to the prosecutor prior to the prosecutor filing any charges against Autrey. Included in that packet "would have been the PCRs [preliminary complaint records] or the CRISNET reports," "[t]he copies of the *Garrity* interviews with the witness officers, the interoffice memorandum that was prepared by Commander, former Commander Autrey, the accident report and whatever relative [sic] information regarding this matter would've been in the report."

The plaintiff also claims that the warrant request contained no mention of the facts that certain notifications were not made and that the Internal Affairs Alert Team was not notified until two hours after Bettison's accident. Such "omissions" from the report are of no import, however, because those facts in no way contradict the assertion that Autrey improperly removed items from the scene of the accident. To counteract that evidentiary insufficiency, the plaintiff additionally complains that the prosecutor would not have pursued charges against him had the attorney been informed that the accident site had never officially been declared a crime scene. Regardless of the lack of any such official notice, even Autrey admitted that, upon his arrival at the scene, the area was still blocked off by marked police vehicles. Moreover, although the plaintiff saw no police tape at the

location indicating a crime scene, both Sergeant Hayes and Commander Serda testified in their depositions that yellow crime-scene tape did in fact mark off the area when they visited the scene, Serda doing so only shortly before Autrey's arrival at the location.

Even assuming that the plaintiff's assertions are correct, as we must do at the summary judgment stage of the proceedings, the defendants and the prosecuting attorney still would have been justified in pursuing charges against Autrey. The plaintiff himself admitted that he knew, prior to disposing of the alcohol bottles, that Bettison's blood-alcohol content was well above legal limits; therefore, the plaintiff should have known that those bottles were of relevance to the investigation of the automobile accident. Thus, the contention that the investigator's report erroneously failed to emphasize that no crime scene had been established at the crash site had no effect on the decision to bind the plaintiff over for trial.

Similarly, there is no merit to Autrey's claims that the defendants made material misstatements to the prosecutor in order to influence that official to bring charges against the plaintiff. Even though he did not argue during the preliminary examination that false testimony was being offered, Autrey now points to several alleged falsehoods made by the defendants: the claim in the warrant request that Autrey "responded" to the accident location; the additional claim in the warrant request that indicates that an actual crime scene had been designated; and the defendants' assertion that "evidence" was removed by the plaintiff. Those allegations of mendacity cannot withstand examination, however.

First, it is true that the investigator's report does state that the plaintiff "responded to an accident location, which involved another off-duty Detroit Police Department Commander and removed evidence from the crime scene and disposed of it." Autrey reads the statement that he "responded" to the location as an intimation that he was the *first* police department employee, or at least the first official, to appear at the scene. However, the fact that Autrey did not arrive at the crash site until some two hours after the accident occurred in no way transforms the statement that he "responded" to the scene into a falsehood.

Likewise, the report's mention of a "crime scene" is not an indication that the defendants made a material misstatement in their submission to the prosecuting attorney. Regardless of whether any specific individual used the phrase "crime scene" on April 28 in reference to the accident site, the deposition testimony and other record evidence make clear that at least two marked police cars secured the area around the crash for approximately four hours and that crime-scene tape was placed around the vehicle and the collision location in order to restrain civilians from entering the area. Under such circumstances, no reasonable person could contend that no "crime scene" had been established.

Equally untenable is the plaintiff's assertion that the investigative report's reference to Autrey's removal of "evidence" indicates that defendants Kennedy and Stair were untruthful. According to Autrey's argument, because preservation of the wine-cooler

- 18 -

bottles was not essential to the success of any prosecution of Bettison for operation of a vehicle while impaired, referring to those bottles as "evidence" overstated the importance of the items in the prosecutorial scheme. In making this allegation, Autrey highlights the deposition testimony of Kennedy who stated that he originally did not believe that the plaintiff was guilty of tampering with "evidence" because he assumed that the wine-cooler bottles were not needed to build a case against Bettison, given that "the blood alcohol level was so high." However, Kennedy also indicated in that same deposition exchange with Autrey's counsel that "irregardless [sic] to him in my opinion, discarding the bottles, it would've been nice to have as far as additional [evidence]."

In short, the plaintiff can point to nothing in the appellate record that properly can be characterized as withheld, exculpatory evidence or as false testimony that was presented to the prosecutor to encourage the bringing of charges against Autrey. Having thus failed to differentiate the state-court probable-cause determination from the probable-cause analysis in the federal cause of action on grounds that additional considerations are at issue in this litigation, Autrey can prevail in his effort to defeat the application of collateral-estoppel principles here only if he can demonstrate that he did not have a "full and fair opportunity to litigate the [probable cause] issue in the earlier proceeding."

In *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds in Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001), we explained:

> We do not hold that every determination in a preliminary hearing should be given preclusive effect in a subsequent § 1983 action. Some preliminary hearings are little more than formalities. Also, even when an opportunity for full adversary proceedings is afforded, strategic concerns may counsel against engaging in such an exercise at the early stages of a criminal proceeding. However, where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.

*See also Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) ("[B]ecause plaintiff had a full and fair opportunity to litigate whether probable cause existed to maintain [the] charge against him, he is barred from relitigating that issue in this § 1983 action.") (footnote omitted); *Restatement (2d) of Judgments* § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Clearly, the preliminary hearing during Autrey's state-court criminal proceedings was far from a "mere formality." As indicated by the district court:

> The preliminary examination before Judge Lipscomb [in the 36th District Court for the City of Detroit – Criminal Division] was an adversary proceeding at which Autrey had a full opportunity to argue there was no probable cause to try him for the crimes charged. Autrey was represented by competent counsel (Michael Rataj). Counsel had an opportunity to call witnesses, present exculpatory evidence, cross-examine witnesses, and argue for the lack of probable cause. Rataj availed himself of these opportunities.

(Citations omitted.)

Nevertheless, despite the efforts undertaken on his behalf at the preliminary examination, the plaintiff contends before this court on appeal that he did not have the full and fair opportunity to litigate the probable cause issue that would justify according the state-court determination preclusive effect in this § 1983 litigation. As support for that assertion, Autrey cites the provisions of § 28(1) of the *Restatement (2d) of Judgments* (1982), which deny preclusive effect to a prior judgment when "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action." Autrey submits that because he was ultimately acquitted of all criminal charges against him, he was not allowed to appeal the earlier probable-cause determination.

In making this argument, the plaintiff relies almost exclusively on a district court opinion in *Hirmuz v. City of Madison Heights*, 469 F. Supp. 2d 466 (E.D. Mich. 2007). Autrey maintains that *Hirmuz* supports his position, positing that the district court in that case refused to accord preclusive effect in a § 1983 case to a state-court suppression-hearing ruling because Hirmuz's subsequent acquittal on all criminal charges prevented him from later appealing the determination that his confession to the police was voluntary. In fact, although the district court did seemingly hold that collateral estoppel did not apply in that case because "[t]he state trial judge's decision on the voluntariness of the plaintiff's confession was not appealable because of the plaintiff's acquittal," *id.* at 479, the court's decision actually rested upon a much more fact-based ground. The district court's opinion in *Hirmuz* continued:

> Moreover, the state court judge *did not hold that the statement was voluntary*. She merely held that there was a credibility issue to be determined by a jury. Indeed, the criminal trial judge's ruling itself suggests that it did not have preclusive effect since she held that the issue could be relitigated before the jury. The jury's acquittal suggests that it did not accept the validity or accuracy of the confession.

*Id.* (emphasis added).

Thus the validity of Hirmuz's confession never was finally determined in state court. The prior state-court ruling on that matter therefore could not serve to preclude a relitigation of that issue in a later proceeding. Given those factual distinctions, *Hirmuz* does not stand for the broad proposition that Autrey wishes to assign it.

Again, our evaluation of the fullness and fairness of the opportunity granted to the plaintiff to litigate the probable-cause determination in this matter is constrained by the clear dictates of *Coogan* and *Smith*. "[B]ecause plaintiff had a full and fair opportunity to litigate whether probable cause existed to maintain [the] charge against him, he is barred from relitigating that issue in this § 1983 action." *Smith*, 136 F.3d at 1077. Autrey's challenge to the application of collateral-estoppel principles to his § 1983 cause of action is without merit.

**CONCLUSION**

For the reasons set out above, we conclude that the district court appropriately applied collateral estoppel principles to foreclose Autrey from relitigating in federal court

the very issue that he had the opportunity to contest in a prior state-court proceeding.  That

decision renders moot the other issues raised in this appeal.

The district court's judgment is AFFIRMED.