*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RONALD BUCKLEY,

        Plaintiff-Appellant,

v

CITY OF WESTLAND, CHIEF JEFFREY JEDRUSIK, DEPUTY CHIEF BRIAN MILLER, DEPUTY CHIEF RANDAL THIVIERGE, LIEUTENANT JASON BLANCHARD, SERGEANT JAMES STARKS, OFFICER JASON NEVILLE, OFFICER JAMES COMPTON, and OFFICER DEREK GOMEZ,

        Defendants-Appellees.

UNPUBLISHED
November 21, 2024
12:15 PM

No. 366196
Wayne Circuit Court
LC No. 21-009176-CD

Before: JANSEN, P.J., and RICK and PATEL, JJ.

PER CURIAM.

In this employment action, plaintiff, Ronald Buckley, appeals as of right the trial court order granting defendants' motion for summary disposition under MCR 2.116(C)(7), (8), and (10). Plaintiff was terminated from the Westland Police Department (WPD) for violating numerous policies and regulations during an incident involving a jail detainee while plaintiff was the supervising sergeant responsible for overseeing the jail and its detainees. Plaintiff filed this action against the city, Chief Jeffrey Jedrusik, Deputy Chief Brian Miller, Deputy Chief Randal Thivierge, Lieutenant Jason Blanchard, Sergeant James Starks, Officer Jason Neville, Officer James Compton, and Officer Derek Gomez alleging that he was wrongfully terminated and maliciously prosecuted. He asserted claims for age discrimination under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101, *et seq.*, disability discrimination in violation of the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1201, *et seq.*, malicious prosecution, invasion of privacy–false light, civil conspiracy, and intentional infliction of emotional distress (IIED).

The trial court concluded that the city and Chief Jedrusik were entitled to governmental immunity for all of plaintiff's tort claims. Although the trial court held that none of the other

-1-

individual defendants were entitled to governmental immunity, it concluded that plaintiff failed to establish a genuine issue of material fact for any of his tort claims. The trial court further concluded that even if plaintiff could establish a prima facie case of age or disability discrimination, defendants articulated a legitimate, nondiscriminatory reason for plaintiff's termination and plaintiff failed to establish that discrimination was a motivating factor.

On appeal, plaintiff argues that the city is not entitled to governmental immunity under MCL 691.1407(1) because the city and its officers were engaged in a corrupt investigation, which is not a governmental function. Plaintiff further asserts that Jedrusik is not entitled to absolute immunity under MCL 691.1407(5) because Jedrusik failed to present evidence of his authority. Plaintiff also argues that there are genuine issues of material fact regarding each of his discrimination and tort claims. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. PLAINTIFF'S EMPLOYMENT HISTORY

Plaintiff was hired as a patrolman by the WPD in August 2000. At all relevant times, the terms of his employment were governed by a collective-bargaining agreement.

In 2013, plaintiff was diagnosed with colorectal cancer. He underwent resection surgery and was off of work for three months. As a result, plaintiff has to use the restroom more frequently and with a sense of urgency. When plaintiff returned to work following his surgery, he used a restroom that was located outside of the chief's and deputy chief's office. Plaintiff had seen other WPD employees use that restroom on multiple occasions. But after plaintiff used the restroom one day, his supervisor, Lt. Matthew Price, told him that Chief Jedrusik did not want him using that restroom. Plaintiff believed that he was told not to use the restroom because of his colorectal cancer.

Plaintiff also sustained work-related back injuries in 2002 and 2010. He underwent lumbar spinal fusion surgery in March 2010. In March 2017, plaintiff reported to Chief Jedrusik, Deputy Chief Miller, and the personnel department that he had ongoing lumbar pain from his 2010 work-related injury as well as pain radiating to his cervical spine. Plaintiff underwent cervical fusion of his C5-C7 vertebrae in March 2018.

### B. DEATH OF JAIL DETAINEE

In December 2017, Compton and Gomez performed a traffic stop. William Marshall was the driver and sole occupant of the vehicle. During the traffic stop, Compton observed small pieces of what appeared to be "crack" cocaine in and around Marshall's mouth. Dash-cam video captured Compton and Gomez questioning Marshall numerous times about the cocaine he had just ingested, and telling him that he could die from ingesting cocaine. Marshall repeatedly denied eating cocaine and claimed it was a doughnut. Compton and Gomez recovered cocaine from Marshall's lips/mouth and placed it in an evidence bag. Marshall was arrested for driving while license suspended, possession of cocaine, and possession of marijuana. Compton and Gomez did not request medical attention for Marshall or transport him to the hospital.

Compton and Gomez arrived at the WPD with Marshall at approximately 6:27 a.m. Compton and Gomez allegedly informed the night shift commander, Starks, and the day shift commander, Blanchard, that Marshall may have ingested crack cocaine. Compton wrote the following in the arrest report: "I spoke with Marshall and had him open his mouth. I then observed numerous small pieces of crack cocaine on Marshall's tong[ue], gums, and lips. I was able to use a pair of gloves and retrieve several pieces of the crack cocaine." Starks approved the arrest report at 6:31 a.m.

Plaintiff arrived at the WPD for his shift at approximately 6:30 a.m. Neither Compton, Gomez, Starks, or Blanchard told plaintiff that Marshall may have ingested cocaine. Plaintiff contended that he "asked about the listed William Marshall who was in the detoxification cell and appeared to be crawling along the floor." According to plaintiff, "Starks advised me that Marshall is an [sic] SIU prisoner that was recently brought in and had 'pins in his ankles' which prevented him from walking normally, but appeared to be in good health."

A Police Service Aid (PSA), Bailey Flinchum, completed Marshall's booking. During booking, Marshall denied that he needed medical attention. When Marshall was asked when he last used any illegal drugs, he stated that he used marijuana the day before. Marshall allegedly did not show any signs of drug intoxication during the booking process. He was placed in the detox holding cell at approximately 6:58 a.m.

At 7:51 a.m., Marshall shook while lying face down on the floor of the cell. Another detainee banged on the cell door to alert the PSAs. PSA Tyler Riblett entered the cell at 7:52 a.m., then alerted PSA Flinchum, who also came to the cell. While Flinchum stood at the open cell door watching Marshall, PSA Riblett walked to the supervisor's office and told plaintiff and Blanchard that "[t]he guy in the holding cell that nights brought in is saying he is having a seizure, but I [PSA Riblett] don't know of anyone who can talk while having a seizure." Blanchard instructed plaintiff to summon the emergency medical technicians (EMTs), but did not disclose that Marshall may have ingested cocaine.

Dispatch logs reflect that Westland Fire Department (WFD) was dispatched at 7:53 a.m. Video footage reflects that Marshall continued to shake and thrash about while lying on the floor of the cell as PSA Flinchum stood at the open cell door and watched. At 7:54 a.m., plaintiff entered the cell, looked at Marshall shaking on the floor, left the cell with PSA Flinchum, and secured the door behind them. Marshall continued to shake on the cell floor. At 7:57 a.m., a detainee knocked on the cell window or door several times. Marshall crawled across the floor toward the cell door. At 7:58 a.m., PSA Flinchum opened the cell door and monitored Marshall from the hallway with PSA Riblett. Marshall briefly held onto the bottom of the open door as he made convulsing movements on the floor. He raised himself onto his hands and knees, but continued to convulse and slid back onto his stomach.

WFD firefighters Matthew Dicosola and Leah Maynard, who were both sworn firefighters and licensed paramedics, arrived at the WPD at approximately 8:01 a.m. Plaintiff informed Dicosola and Maynard that Marshall was there "for cocaine, marijuana, driving on a suspended. Faking seizures. Right before he got here he was talking to everybody." PSA Flinchum confirmed that Marshall was talking to them, and stated that Marshall grabbed onto the open cell door and tried to pull himself over. When Dicosola attempted to remove Marshall from the cell to examine him, Marshall grabbed onto the cell door. Dicosola removed Marshall's hands from the door and

pulled him into the hallway with assistance from PSA Riblett. Marshall repeatedly stated that he was having a seizure, but Dicosola and Maynard told him each time that he was not having a seizure.[1]

The PSAs and plaintiff struggled to get Marshall to sit up against the wall so that Dicosola and Maynard could examine him. During the struggle, plaintiff asked Dicosola, "Do you guys want to deal with him and take his vitals or something or what?" Dicosola explained that they could check Marshall, but that he was not having a seizure. Plaintiff asked, "Do you want us to just throw him back in [the cell]?" Dicosola stated that he and Maynard could transport Marshall to the hospital, but reiterated that Marshall was not having a seizure. At 8:07 a.m., PSA Riblett and PSA Elizah Kozak dragged Marshall back into the cell. Plaintiff told Marshall, "We're done playing. We got better things to do than play around with you." As Marshall was lying on the floor of the cell near the door continuing to shake, Dicosola asked plaintiff if he was "good with leaving [Marshall]" at the WPD. Plaintiff responded "yeah" and stated that he believed Marshall was faking the seizures. Plaintiff explained that it would be easier to observe Marshall in the detox cell, and stated that there would be others in the cell with him. Dicosola and Maynard left the WPD at approximately 8:10 a.m. They did not take Marshall's vitals while they were at the WPD.

After Dicosola and Maynard left, Marshall remained lying on the floor. At one point, he propped himself up on his elbows, drank from a cup, and talked to other detainees. He then pushed himself to a seated position near the cell door. At 8:25 a.m., PSA Summer Chalfin and PSA Kozak entered the detox cell. Marshall clung to the open cell door. PSA Chalfin asked Marshall if he wanted to sit on the bench. PSA Kozak kicked Marshall's hand several times while trying to shut the cell door. Officer Chad Bristol observed the interaction and told the PSAs to "play the waiting game."

At 8:27 a.m., plaintiff pushed open the cell door (which Marshall was still clinging to), pushed Marshall onto his stomach, placed his knee on Marshall's back, pushed Marshall's head toward the floor, thrust Marshall's arm away from the door, and shut the cell door. For the next several minutes, plaintiff and PSA Kozak moved in and out of the cell retrieving other detainees while Marshall lay on the floor shaking and periodically grabbing at the door. At 8:30 a.m., plaintiff stepped into the cell and Marshall grabbed at his feet. Plaintiff forcefully pushed Marshall back into the cell and put his knee across Marshall's back before shutting the cell door.

Marshall remained on the floor of the cell, visibly shaking and convulsing, for approximately 25 minutes. During that time, no one entered the cell to check on Marshall. But multiple officers and PSAs, including plaintiff, were working and roaming the hallways. At 8:55 a.m., PSA Chalfin, Officer Neville, and PSA Kozak looked into the cell through the window. PSA Chalfin unlocked and opened the cell door. Neville called into the cell, "Mr. Marshall, quit playing around. Do you want to get out of jail today or what?" Neville opened the door further, nudged Marshall with his foot, and urged Marshall to make a statement. Marshall did not respond. Again,

---

[1] On one occasion Dicosola stated, "You're not having a seizure. . . . You're not having a seizure, so stop." When Marshall told Maynard several times that he was having a seizure, Maynard stated, "Guess what, no you're not." Dicosola then told Marshall, "We are not playing that game. You are not having a seizure."

Neville nudged Marshall with his foot and asked if he wanted to get out of jail. Marshall still did not respond. Neville left the cell at 8:57 a.m., and PSA Kozak closed the door. Officer Neville had a brief conversation with PSA Kozak, stating, "he didn't have enough. That is the problem. He just tried to eat it."

At 8:59 a.m., PSA Chalfin opened the cell door. Neville leaned into the cell, stating, "Hey Mr. Marshall, can you hear me? Alright, I wrote you some tickets. Okay? I'm going to discharge you. You're getting out of here. Can you get up? Hey, if you can get up, we can get you out of here. I wrote you some tickets, alright?" When Marshall did not respond, Neville nudged him with his foot. PSA Chalfin and plaintiff watched from the hallway as Neville nudged Marshall with his foot and instructed him to get up. Neville walked out of the cell and shut the door at approximately 9:00 a.m. Marshall remained lying face down on the floor of the cell.

From approximately 8:56 a.m. to 9:08 a.m., Marshall did not make any noticeable movement while he lay face down on the floor of the cell. Beginning at approximately 9:09 a.m., Marshall convulsed for approximately seven minutes. At approximately 9:16 a.m., Marshall stopped moving. At 9:26 a.m., plaintiff and Neville both looked into the cell, but neither took any action. Plaintiff returned to his office and instructed Bristol to check on Marshall. Plaintiff maintained that he "requested that [Bristol] check on Marshall in the detoxification cell since I was unable to observe his chest rise and fall visually through CCTV and I didn't observe any further movement from him."

At 9:28 a.m., Bristol looked into the cell and, after a brief observation, opened the door and peered in. Bristol checked Marshall's wrist for a pulse and shook Marshall. Marshall did not respond or move. Bristol walked out of the cell and shut the door at 9:31 a.m. Bristol returned to the cell one minute later and rolled Marshall onto his back. Plaintiff and PSA Kozak looked on. Plaintiff walked away as Bristol and Kozak dragged Marshall into the hallway. Bristol retrieved an automated external defibrillator (AED), placed the AED pads on Marshall, and began administering CPR as instructed by the AED. Medical personnel from the WFD arrived at the jail at approximately 9:39 a.m. Marshall was pronounced deceased upon his arrival at the hospital. Postmortem toxicology revealed a very high/lethal level of cocaine in Marshall's blood. A plastic baggie was found in his stomach during the autopsy. The medical examiner opined that Marshall's death was caused by cocaine toxicity.

On the date of Marshall's death, Chief Jedrusik instructed Deputy Chief Miller to conduct an investigation into the circumstances regarding Marshall's death and determine whether any WPD policies and procedures were violated. The following day, the Wayne County Prosecutor's Office (WCPO) informed Jedrusik that the criminal investigation would be conducted by the Michigan State Police (MSP). WPD continued its internal investigation. However, an agreement between the WPD and both police unions protected union employees from being interviewed or

disciplined while the criminal investigation was ongoing.[2]  Plaintiff remained on the job during the investigation.

The MSP criminal investigation was assigned to Detective Sean Street, who determined that there was no information proving that plaintiff had any knowledge that Marshall ingested cocaine.  Detective Street also concluded that plaintiff did nothing wrong with respect to Marshall's care.  Nevertheless, plaintiff was charged by the WCPO with involuntary manslaughter and misconduct in office.[3]  Three days later, the city terminated plaintiff's employment because of his violation of numerous WPD policies and regulations during the Marshall incident.[4]  Plaintiff filed a grievance appealing his termination, which an arbitrator ultimately upheld.  The manslaughter charges were dismissed following a preliminary examination based on a finding of no probable cause, and a jury found plaintiff not guilty of misconduct in office.

## C.  PROCEDURAL HISTORY

Plaintiff brought this action against defendants alleging: (1) age discrimination under the ELCRA against all defendants; (2) disability discrimination in violation of the PWDCRA against all defendants; (3) malicious prosecution against the city, Chief Jedrusik, Deputy Chief Miller, and Deputy Chief Thivierge; (4) invasion of privacy–false light against all of the individual defendants; (5) civil conspiracy against all of the individual defendants; and (6) IIED against all of the individual defendants.

Following discovery, defendants moved for summary disposition under MCR 2.116(C)(7)(8) and (10), which the trial court granted.  Plaintiff moved for reconsideration, which the trial court denied.  This appeal followed.

## II.  STANDARD OF REVIEW

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

---

[2] PSA Chalfin, a nonunion employee, was interviewed while the criminal investigation was ongoing based on a comment overheard on the audio that she made to Marshall that needed to be clarified.  Jedrusik maintained that none of the questions posed to Chalfin during her interview pertained to Marshall's death, and her interview had nothing to do with plaintiff's termination.

[3] Dicosola and Maynard were also criminally charged with Marshall's death, and the WFD terminated Maynard and Dicosola as a result of the incident.

[4] The WPD also concluded that Compton, Gomez, PSA Riblett, and PSA Kozak violated department policies.  Compton and Gomez received written reprimands for their policy violations. Kozak received a 24-hour suspension and defensive tactics training.  Riblett was to receive a 24-hour suspension for his violations, but he was terminated for other reasons before the suspension was issued.  Although it was determined that Blanchard did not violate policy, he was verbally counseled because the WPD concluded "that more could have been done to assure those working under his command were in fact following strict policy."

-6-

Summary disposition under MCR 2.116(C)(7) is proper when a claim is barred because of immunity granted under the law. *Moraccini v City of Sterling Heights*, 296 Mich App 387, 391; 822 NW2d 799 (2012). This Court considers all documentary evidence in a light most favorable to the nonmoving party under MCR 2.116(C)(7). *Id*. "If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide." *Id*. (cleaned up).

"Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and the trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008). Summary disposition under MCR 2.116(C)(10) is proper when, after considering all evidence in the light most favorable to the nonmoving party, the court determines there is no genuine issue of material fact. *El-Khalil*, 504 Mich at 160.

## III. GOVERNMENTAL IMMUNITY

Plaintiff argues that the trial court erred by holding that the city is entitled to governmental immunity under MCL 691.1407(1) because the city and its officers were engaged in a corrupt investigation, which is not a governmental function. Plaintiff further asserts that the court erred by holding that Chief Jedrusik is entitled to absolute immunity under MCL 691.1407(5). We disagree.

The governmental tort liability act (GTLA), MCL 691.1401, *et seq*., grants a governmental agency immunity from tort liability if the agency was engaged in the exercise or discharge of a governmental function, subject to certain enumerated exceptions. MCL 691.1407(1); *Bernardoni v City of Saginaw*, 499 Mich 470, 473; 886 NW2d 109 (2016). A city is a governmental entity for purposes of the GTLA. *Moraccini*, 296 Mich App at 389. "[A] city's operation of a police department is a governmental function. *Bennett v Detroit Police Chief*, 274 Mich App 307, 315; 732 NW2d 164 (2006). The hiring, supervision, and discharge of employees is also a governmental function. See *Galli v Kirkeby*, 398 Mich 527, 537; 248 NW2d 149 (1976). To determine whether an act constitutes a governmental function, this Court must consider "the general activity involved rather than the specific conduct engaged in when the alleged injury occurred." *Ward v Mich State Univ (On Remand)*, 287 Mich App 76, 84; 782 NW2d 514 (2010).

In this case, it is undisputed that none of the statutory exceptions apply to plaintiff's tort claims. Plaintiff argues that the city is not entitled to immunity from his malicious prosecution claim because the city and its officers were engaged in an ultra vires activity—a corrupt investigation. Ultra vires activity "is activity that the governmental agency lacks legal authority to perform in any manner." *Richardson v Jackson Co*, 432 Mich 377, 387, 443 NW2d 105 (1989). "[U]ltra vires activity is not activity that a governmental agency performs in an unauthorized manner." *Id*. The city had legal authority to conduct an investigation to determine whether discipline or termination of any of its officers was warranted as a result of the Marshall incident. Further, the city cannot be held liable for the individual defendants' alleged tortious actions during the investigation. See *Payton*, 211 Mich App at 393 (holding that a governmental entity "cannot

be held liable for the intentional torts of its employees."). Accordingly, the trial court did not err by holding that the city is immune from plaintiff's tort claims.[5]

Plaintiff further argues that the court erred by holding that Chief Jedrusik, as the highest-ranking executive official at the WPD, was immune from liability for all of plaintiff's tort claims under MCL 691.1407(5), which provides absolute immunity from tort liability to certain governmental employees acting within the scope of their authority:

> A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

To show entitlement to absolute immunity from tort liability, a governmental employee must establish "(1) that he or she is a judge, legislator, or the elective or highest appointive executive official of a level of government and (2) that he or she acted within the scope of his or her judicial, legislative, or executive authority." *Petipren v Jaskowski*, 494 Mich 190, 204; 833 NW2d 247 (2013).

Governmental officials bear the burden of establishing entitlement to absolute immunity. *Id*. But "the GTLA does not define what it means to 'act[] within the scope of his or her . . . executive authority.' " *Id*. at 205. Our Supreme Court has identified an unexhaustive list of factors to consider in determining whether an act was within the scope of an official's executive authority, "including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government." *Id*. at 206 (cleaned up). "This objective inquiry does not include analysis of the actor's subjective state of mind. An official's motive or intent has no bearing on the scope of his or her executive authority." *Id*. (citation omitted). Whether an official acts with "improper motive and purpose" or an "unlawful intent" is "meaningless." *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 594; 640 NW2d 321 (2001).

Jedrusik testified that he was the only one with the authority to establish policies and procedures for the WPD. Further, all discipline for WPD employees must go through the Chief, who has the ultimate authority to determine the discipline. This includes "any form of written reprimand, suspensions, [and] terminations . . . ." Plaintiff alleges that Jedrusik acted outside the scope of his authority because he was engaged in a corrupt investigation that was designed to cover up the misconduct of other officers and make plaintiff the scapegoat for Marshall's death. But whether Jedrusik acted with "improper motive and purpose" or an "unlawful intent" is "meaningless." *Id*. As our Supreme Court held in *American Transmissions Inc v Attorney General*, 454 Mich 135, 143; 560 NW2d 50 (1997), the plain language of MCL 691.1407(5) does not contain a "malevolent-heart" exception to the broad grant of absolute immunity. While our

---

[5] It is undisputed that governmental immunity is not an available defense to discrimination claims under the ELCRA and the PWDCRA. See *In re Bradley Estate*, 494 Mich 367, 393 n 60; 835 NW2d 545 (2013); *Manning v City of Hazel Park*, 202 Mich App 685, 699; 509 NW2d 874 (1993).

Supreme Court has instructed that a number of factors must be considered to determine whether an official is acting with the scope of his or her executive authority, none of those factors include motive or an inquiry into the official's subjective state of mind. *Id.* Accordingly, the trial court did not err by concluding that Jedrusik is entitled to absolute immunity.

## IV. AGE DISCRIMINATION

Plaintiff argues that the trial court erred by granting defendants' motion for summary disposition on plaintiff's age discrimination claim because there are genuine issues of material fact whether plaintiff was terminated due to his age and whether defendants' proffered reasons for plaintiff's termination were merely pretextual. We disagree.

MCL 37.2202(1)(a) provides that an employer "shall not" "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." "The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Natl Heritage Acads, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016) (cleaned up).

"Proof of discriminatory treatment in violation of the CRA may be established by direct evidence or by indirect or circumstantial evidence." *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 132; 666 NW2d 186 (2003). "In cases involving direct evidence of discrimination, a plaintiff may prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case." *Id.* "Direct evidence," in the context of a CRA claim, is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001) (cleaned up). "Perhaps the best *general* definition of direct evidence is that it is evidence that proves impermissible discriminatory bias without additional inference or presumption." *Hecht*, 499 Mich at 607 n 34. See *DeBrow v Century 21 Great Lakes, Inc (After Remand)*, 463 Mich 534, 538; 620 NW2d 836 (2001) (holding that a decision-maker's statement to the plaintiff that he was "getting too old for this shit" that was made during the meeting in which the plaintiff was fired was direct evidence of age discrimination that precluded summary disposition in favor of the employer).

In a case where direct evidence is lacking, the *McDonnell Douglas*[6] framework "allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Hazle*, 464 Mich at 462 (cleaned up).[7] A plaintiff can establish a rebuttable prima facie case of discrimination by presenting evidence that he (1) belongs to a protected class, (2) suffered an adverse employment

---

[6] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

[7] The *McDonnell Douglas* framework was initially created for use in race discrimination cases, but the Supreme Court adopted it for use in age and gender discrimination cases brought under the ELCRA. See *Matras v Amoco Oil Co*, 424 Mich 675, 683 n 3; 385 NW2d 586 (1986).

action, (3) was qualified for the position, and (4) was treated differently than similarly situated employees who were not in a protected group. *Id*. at 463. If a plaintiff establishes a prima facie case, there is a presumption that the defendant's actions were discriminatory. *Id*. The burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id*. at 464. If the defendant meets its burden, "the presumption created by the *McDonnell Douglas* prima facie case drops away." *Id*. at 465.

At this point, "in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id*. (cleaned up). The plaintiff then must "show, by a preponderance of admissible direct or circumstantial evidence, that there [is] a triable issue that the employer's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Lytle v Malady (On Rehearing)*, 458 Mich 153, 174; 579 NW2d 906. A plaintiff may establish pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Debano-Griffin v Lake Co*, 493 Mich 167, 180; 828 NW2d 634 (2013) (cleaned up). However, "[t]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Town v Michigan Bell Telephone Co*, 455 Mich 688, 704; 568 NW2d 64 (1997), abrogated in part on other grounds by *Gross v FLB Fin Servs*, Inc, 557 US 167; 129 S Ct 2343; 174 L Ed 2d 119 (2009) (cleaned up). "[F]or purposes of a motion for summary disposition . . . , a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Hazle*, 464 Mich at 466.

In this case, plaintiff attempted to establish age discrimination with both direct evidence and circumstantial evidence. First, plaintiff testified that his former supervisor in the detective bureau from 2013 to 2017 and his subsequent supervisor in the traffic bureau referred to plaintiff as "old man." Plaintiff also testified that, several times, his "cubical was decorated with old men in wheelchairs, old men with casts on their foot, old men in canes, while [he] had [the] walking boot on." On another day, someone had made a disability sign and put it in front of plaintiff's parking spot. Plaintiff maintained that the jokes persisted for four years. However, plaintiff never complained about the harassment. More importantly, plaintiff admitted that Chief Jedrusik, Deputy Chief Miller, Lt. Blanchard, Sgt. Starks, Neville, Compton, and Gomez never discriminated against him based on his age. Plaintiff contends on appeal that Deputy Chief Thivierge was one of the persons who referred to him as "old man" and Chief Jedrusik was aware of this conduct, but the record does not support this argument.

Stray or isolated remarks are not direct evidence of discrimination. See *Krohn v Sedgwick James of Mich, Inc*, 244 Mich App 289, 298–299; 624 NW2d 212 (2001); see also *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 469 Mich. 124, 135-136; 666 NW2d 186 (2003). This Court evaluates whether comments are stray remarks by applying four factors: "(1) Were the disputed remarks made by the decisionmaker [sic] or by an agent of the employer uninvolved in the challenged decision? (2) Were the disputed remarks isolated or part of a pattern of biased

comments? (3) Were the disputed remarks made close in time or remote from the challenged decision? (4) Were the disputed remarks ambiguous or clearly reflective of discriminatory bias?" *Krohn*, 244 Mich. at 292.

In this case, the alleged "old man" remarks were made by two nonparties who were not decision makers in plaintiff's termination. Plaintiff claimed that the remarks were part of a pattern of biased comments and ridicule from the two nonparties, but he did not present any evidence that the decision makers were aware of the remarks. In fact, plaintiff testified that he never reported the remarks. The disputed remarks also were not made at the time of plaintiff's termination, or by Chief Jedrusik, who made the decision to terminate plaintiff. Further, the remarks were not clearly reflective of discriminatory bias. Plaintiff did not present any evidence that the two nonparties, who were his supervisors at the time the remarks were made, took any adverse employment action against him that would reflect a discriminatory bias. Accordingly, we conclude that the trial court did not err by concluding that nonparties' references to plaintiff as "old man" was not sufficient to prove a direct case of age discrimination.

Because plaintiff did not present direct evidence of age discrimination, he was required "to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Hazle*, 464 Mich at 462 (cleaned up). The parties did not dispute that plaintiff was in a protected class concerning his age, suffered an adverse employment action, and was qualified for the position. See *id.* at 463. Instead, plaintiff argued that younger officers involved in the Marshall incident were not terminated and he was replaced with a younger employee. Because defendants do not contest that plaintiff established a prima facie case of discrimination, we will presume, like the trial court, that plaintiff could establish a prima facie case of age discrimination.

Once a presumption of discrimination arose, the burden shifted to defendants "to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id.* at 464. A "defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.* at 465. In this case, defendants presented evidence that plaintiff was terminated because he violated department policies and failed to obtain necessary medical treatment for a detainee who "displayed an obvious and continuing need for medical attention . . . ." A court may not analyze the "soundness" of an employer's decision to terminate in determining whether it is a "legitimate, nondiscriminatory" one. *Id.* at 464 n 7. "In other words, courts must not second guess whether the employment decision was 'wise, shrewd, prudent, or competent.' " *Id.*, quoting *Town*, 455 Mich at 704. We conclude that the trial court did not err by concluding that defendants made a sufficient showing that they had legitimate, nondiscriminatory reasons for terminating plaintiff.

The burden then shifted to plaintiff to "show, by a preponderance of admissible direct or circumstantial evidence, that there [is] a triable issue that the employer's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Lytle (On Rehearing)*, 458 Mich at 174. Plaintiff maintains that there is a question of fact whether his termination was pretextual because he was the only WPD employee terminated as a result of the Marshall incident, but younger members of the WPD violated department policies and procedures and were equally responsible. In order to create an inference of disparate treatment, plaintiff must prove that he, Compton, Gomez, Starks, and Blanchard "were similarly situated, i.e., all of the relevant aspects

of his employment situation were nearly identical" to those of the other officers' employment situation.[8]  *Town*, 455 Mich at 699-700 (cleaned up).

Compton and Gomez were not similarly situated to plaintiff.  It is undisputed that neither Compton nor Gomez were in a supervisory position.  Plaintiff's discipline was based on his supervisory responsibility over the well-being of the detainees.  Although Starks was in the same employment position as plaintiff, he was also a member of the same protected class given his age and thus his discipline is not probative of unlawful treatment of plaintiff.  Blanchard was also a member of the same protected class given his age and thus his discipline is not probative of unlawful treatment of plaintiff either.

Moreover, there are material differences between plaintiff's inactions over several hours that led to his discipline and the alleged inactions of Starks, Compton, and Gomez.  Plaintiff's discipline is based on the fact that Marshall "displayed an obvious and continuing need for medical attention which [plaintiff] failed to provide."  It is undisputed that Marshall did not display a need for medical treatment when Gomez and Compton brought him in for booking, or before Starks completed his shift at 7:00 a.m. and plaintiff assumed the duties as shift supervisor.  Plaintiff admitted that, as the shift supervisor, he supervised the jail and supervised the well-being of the jail detainees, such as Marshall.

The evidence reflects that Marshall was lying on the floor of the cell and exhibited convulsive-like movement beginning at approximately 7:51 a.m., which was after Compton, Gomez, and Starks ended their shifts.  Despite plaintiff's responsibility for the well-being of the jail detainees, plaintiff did not look at the monitors or personally observe Marshall display any convulsive-type movement until after the EMTs arrived at 8:01 a.m.  Although plaintiff had no personal knowledge, he told the EMTs that Marshall was "faking seizures."  Plaintiff recognized that the EMTs failed to perform a basic vital assessment for Marshall.  Plaintiff was responsible to supervise the well-being of the jail detainees, but he did not insist that the EMTs perform a proper medical evaluation or ensure that Marshall was transported to the hospital.  After the EMTs left at approximately 8:10 a.m., plaintiff observed Marshall lying on the floor moving around "[a] little bit."  Marshall continued to exhibit convulsive-type activity, but plaintiff believed that Marshall was faking the seizures and made no effort to assess him further.  The evidence reflects that Marshall was lying on the floor of the cell, visibly shaking and convulsing, for approximately 25 minutes from 8:30 a.m. to 8:55 a.m.  During that time, no one entered the cell to check on Marshall.  At 9:26 a.m., nearly 90 minutes after the EMTs left, plaintiff glanced in the cell, noted that Marshall appeared to be "sleeping, in a resting state," but did not check on him.  Instead, he instructed Bristol to check on Marshall.  At that time, Marshall did not have a pulse.

Plaintiff was one of the supervisors of the jail and he was required to supervise the well-being of the detainees, such as Marshall.  Plaintiff was terminated because he violated WPD policies and procedures by failing to obtain medical attention for Marshall despite his obvious and continuing need for medical attention, as well as his inappropriate use of force.  An arbitrator upheld the termination, determining that there was just cause.  Viewing the evidence in a light

---

[8] On appeal, plaintiff does not attack the disciplinary decisions regarding the PSAs involved in the Marshall incident, who were clearly not similarly situated.

most favorable to plaintiff and drawing any reasonable inferences in his favor, we conclude that plaintiff has failed to establish a genuine issue of material fact whether age was a motivating factor in defendants' employment decision.

## V. DISABILITY DISCRIMINATION

Plaintiff also argues that the trial court erred by granting summary disposition in favor of defendants on plaintiff's disability discrimination claim under the PWDCRA because there is a genuine issue of material fact whether plaintiff was terminated due to his disability and whether defendants' proffered reasons for plaintiff's termination were merely pretextual. We disagree.

The PWDCRA provides that the opportunity to obtain employment without discrimination based on disability is a civil right. MCL 37.1102(1). The PWDCRA states that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." MCL 37.1202(1)(b). To prove a violation of the PWDCRA, a plaintiff must show:

> (1) that he is disabled as defined in the act, (2) that the disability is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute. [*Jewett v Mesick Consolidated Sch Dist*, 332 Mich App 462, 471; 957 NW2d 377 (2020) (cleaned up).]

The PWDCRA "generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job." *Id*. (cleaned up).

Defendants do not contest that plaintiff established a prima facie case for discrimination. Just as with age discrimination cases, disability discrimination cases follow the *McDonnell Douglas* burden shifting analysis. *Peden v City of Detroit*, 470 Mich 195, 205; 680 NW2d 857 (2004). "If a plaintiff establishes a prima facie case of employment discrimination, the burden shifts to the defendant to articulate a legitimate business reason for the decision." *Jewett v Mesick Consolidated Sch Dist*, 332 Mich App 462, 474; 957 NW2d 377 (2020). As discussed above, defendants presented a legitimate business reason for plaintiff's termination. "If a defendant provides a legitimate business reason, then the burden returns to the plaintiff to prove that the reason was a pretext." *Id*. A plaintiff may establish pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Debano-Griffin*, 493 Mich at 180 (cleaned up).

Plaintiff maintains that he presented evidence sufficient to establish a genuine issue of material fact whether the reasons offered by defendants for his termination were merely pretextual. Plaintiff testified that after he used a restroom near the administrative offices in June or July of 2013, Price told plaintiff that Chief Jedrusik did not want him using that restroom. But plaintiff admitted that Chief Jedrusik never told him directly that he could not use the restroom. Plaintiff also admitted that he was never given a reason why the Chief did not want him to use the

bathroom.[9]  Plaintiff further testified that before Thivierge was promoted to deputy chief, he would ridicule plaintiff about his cancer, stating, "Oh, let me guess, you got cancer.  Oh, let me guess, you're a survivor.  You don't have to tell everybody you're a cancer survivor."  And after Thivierge was promoted, his replacement continued the same ridicule.  Plaintiff also testified that someone had placed rainbow flags and penis photos in his cubical insinuating that colorectal cancer was a homosexual activity.  Plaintiff admitted that he never reported any of these incidents.  Plaintiff also admitted that Deputy Chief Miller, Blanchard, Starks, Neville, Compton, and Gomez never discriminated against him based on his disability.

Although the comments allegedly made by Thivierge and the ridicule that plaintiff was allegedly subjected to, if true, were inappropriate, none of this behavior establishes that defendants regarded plaintiff as having a disability.  And while plaintiff contends that he was told not to use the bathroom near the administrative offices in 2013 (more than five years before his termination), he has not presented any evidence establishing that the instruction was related to his cancer surgery, or that the instruction came from Chief Jedrusik.  Moreover, none of the statements were made at the time that plaintiff suffered the adverse employment action.  Viewing the evidence in a light most favorable to plaintiff, we conclude that he has failed to establish a genuine issue of material fact whether his alleged disability was a motivating factor in defendants' employment decision.

## VI.  MALICIOUS PROSECUTION

Plaintiff further argues that the trial court erred by granting summary disposition in favor of defendants on plaintiff's malicious prosecution claim because there is a genuine issue of material fact whether the information the WPD failed to provide to the WCPO was relevant to the criminal investigation and thus defendants' actions directly contributed to the prosecutor criminally charging plaintiff with manslaughter.  We disagree.

To establish a claim of malicious prosecution, a plaintiff has the burden to prove

(1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.  [*Matthews v Blue Cross & Blue Shield of Mich*, 456 Mich 365, 378; 572 NW2d 603 (1998).]

A malicious prosecution claim brought against a police officer is viable only when the officer "knowingly swears to false facts in a complaint, without which there is no probable cause." *Payton v Detroit*, 211 Mich App 375, 395; 536 NW2d 233 (1995) (cleaned up).  In other words, there must be evidence giving rise to the inference that the officer "knowingly included false facts in his incident report, without which the prosecutor could not have concluded there was probable cause[.]" *Id*. (cleaned up).

---

[9] Jedrusik denied that he ever stated that plaintiff was not permitted to use that particular bathroom.

It is undisputed that plaintiff's criminal proceedings terminated in his favor, but plaintiff failed to establish a genuine issue of material fact regarding the other elements of malicious prosecution. Other than speculation, plaintiff did not present evidence that any of the defendants participated in the decision to charge him. The WCPO clearly reached its own independent conclusion when it reviewed the evidence. "[I]n Michigan, the prosecutor's exercise of his independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution." *Matthews*, 456 Mich at 365. Further, "[f]ailure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution." *Payton*, 211 Mich App at 395. "Unless the information furnished [to the prosecutor] was known by the giver to be false and was the information on which the prosecutor acted, the private person has not procured the prosecution." *Walsh v Taylor*, 263 Mich App 618, 633 n 10; 689 NW2d 506 (2004) (cleaned up). The trial court did not err by granting summary disposition in favor of defendants on plaintiff's malicious prosecution claim.

## VII. INVASION OF PRIVACY–FALSE LIGHT

Next, plaintiff argues that the trial court erred by granting summary disposition in favor of defendants on plaintiff's invasion of privacy–false light claim because there is genuine issue of material fact whether Chief Jedrusik's public statements regarding the criminal charges filed against plaintiff and the circumstances leading to his termination contained false information. We disagree.

To establish a claim for false-light invasion of privacy, a plaintiff must prove "the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position. *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 69; 919 NW2d 439 (2018) (cleaned up). "Further, the defendant must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Id*. (cleaned up). Finally, "in order to establish a false-light claim, a plaintiff must establish that when the defendant disseminated the information, it was done with actual knowledge or reckless disregard of the truth or falsity of the publicized matter." *Id*. at 73-74. "[M]alice is an element of false-light invasion of privacy, regardless of whether the plaintiff is a public or private figure." *Foundation for Behavioral Resources v WE Upjohn Unemployment Trustee Corp*, 332 Mich App 406, 413; 957 NW2d 352 (2020).

In this case, plaintiff argued that he was portrayed as a criminal before his criminal trial began and thus there was a question on fact regarding his invasion of privacy claim. Plaintiff relied on a statement reported in a newspaper article after plaintiff was criminally charged wherein Chief Jedrusik allegedly stated that plaintiff "had been suspended pending an internal investigation and discipline, which could include termination." Plaintiff also relied on a statement that Jedrusik made after plaintiff was terminated indicating that the WPD "has completed its internal investigation regarding Sergeant Ronald Buckley's involvement in the prisoner incarceration incident which ultimately resulted in the death of William Marshall."

As discussed above, Jedrusik is entitled to absolute immunity for all of plaintiff's tort claims. Plaintiff has not presented any evidence of public statements made by the other individual defendants. Accordingly, the trial court did not err by dismissing plaintiff's false-light claim.

## VIII. IIED

Plaintiff also argues that the trial court erred by granting summary disposition in favor of defendants on plaintiff's IIED claim because there is genuine issue of material fact whether defendants' conduct was extreme and outrageous. We disagree.

"To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Swain v Morse*, 332 Mich App 510, 534; 957 NW2d 396 (2020) (cleaned up). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id*. (cleaned up). Therefore, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lucas v Awaad*, 299 Mich App 345, 359; 830 NW2d 141 (2013) (cleaned up).

"The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Lewis v LeGrow*, 258 Mich App 175, 196; 670 NW2d 675 (2003) (cleaned up). The necessary threshold for establishing that conduct is extreme and outrageous has been described as "formidable." *Atkinson v Farley*, 171 Mich App 784, 788-789; 431 NW2d 95 (1988).

Plaintiff contends that defendants' internal investigation was conducted in a manner that resulted in plaintiff being the scapegoat for Marshall's death and defendants intentionally withheld information so that the prosecutor's investigation was "steered toward" plaintiff and away from other individuals. Plaintiff maintains that defendants' actions tarnished his reputation, ruined his career, and affected his family. As a result, plaintiff claims that he suffered severe emotional distress. As discussed in detail above, plaintiff admitted that he was one of the supervisors of the jail and he was required to supervise the well-being of the detainees, such as Marshall. Although plaintiff was responsible for the well-being of the jail detainees, the evidence reflects that plaintiff failed to ensure that Marshall obtained medical attention despite his obvious and continuing need for medical attention. As a result of plaintiff's violations of WPD's policies and procedures, he was terminated. An arbitrator upheld plaintiff's termination, determining that there was just cause. The trial court did not err by concluding that plaintiff failed to establish the existence of a genuine issue of material fact regarding whether defendants acted in an "extreme and outrageous" way in conducting their investigation and terminating plaintiff See *El-Khalil*, 504 Mich at 160; *Swain*, 332 Mich App at 534. Defendants' conduct was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Swain*, 332 Mich App 534 (cleaned up).

## IX. CIVIL CONSPIRACY

Finally, plaintiff argues that the trial court err by granting summary disposition on plaintiff's civil conspiracy claim. We disagree.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Green v Pontiac Pub Library*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 363459); slip op at 9 (cleaned up). To support a claim of civil conspiracy, a plaintiff must prove a separate, actionable tort as the basis of the conspiracy. *Id*. at ___; slip op at 9-10. Our Supreme Court has defined a "tort" as "an act that has long been understood as a civil wrong that arises from the breach of a legal duty other than the breach of a contractual duty." *In re Bradley Estate*, 494 Mich 367, 381; 835 NW2d 545 (2013). The trial court did not err by determining that plaintiff has not established a separate, actionable tort and thus cannot maintain a conspiracy claim.[10]

Affirmed.

/s/ Kathleen Jansen
/s/ Michelle M. Rick
/s/ Sima G. Patel

---

[10] The trial court also held that the intracorporate-conspiracy doctrine applies, but we do not need to reach this issue given our conclusion.